STATE OF MISSOURI at the relation of the CITY OF ST. LOUIS, a Municipal Corporation, Appellant, v. PUBLIC SERVICE COMMISSION and THE LACLEDE GAS LIGHT COMPANY, a Corporation.

STATE OF MISSOURI at the relation of THE LACLEDE GAS LIGHT COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION and CITY OF ST. LOUIS.—110 S. W. (2d) 749.

Court en Banc, December 9, 1937.

922

924

*Robert W. Otto* and *Taylor, Chasnoff & Willson* for Laclede Gas Light Company.

926

*Edgar H. Wayman* and *John G. Burkhardt* for City of St. Louis.

928

932

*James P. Boyd*, General Counsel, and *Daniel C. Rogers*, Assistant Counsel, for Public Service Commission.

ELLISON, J.—This is an appeal from a judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission dated November 30, 1934, which fixed for rate-making purposes the fair value of the property of the appellant Laclede Gas Light Company, a large public utility operating in St. Louis, and ordered a six per cent reduction in rates to domestic and commercial consumers. The valuation fixed by the Commission is $39,000,000. The Company contends it should be at least $50,000,000. The City of St. Louis, which also has appealed, maintains it does not exceed $27,000,000.

In October, 1925, the Commission found the fair value of the Company's property to be $45,600,000, and no appeal was taken. In 1927 the Commission fixed the value of the property at $47,000,000. On appeal that order was disapproved by this court in State ex rel. City of St. Louis v. Pub. Serv. Comm., 329 Mo. 918, 47 S. W. (2d) 102, P. U. R. 1932A, 305. The Commission then held further hearings and arrived at the valuation here assailed. [7 P. U. R. (N. S.) 277.] The essential, but by no means complete, details of the finding are shown in the table on next page.

The record in this case is voluminous, containing over 2800 printed pages, with original exhibits of equal length filed by stipulation and consent of court. The Company's original and reply briefs contain 390 pages and the City's briefs 356 pages. Counsel for the Public Service Commission also have filed a sixty-page brief. The City makes twenty-one assignments of error, and the Company sixty-four. It is obvious that we cannot discuss all these assignments and the whole evidence within the compass of an opinion of reasonable length.

The Company's physical properties consist of lands owned or leased, right of way, and structural property. This latter is composed of buildings and like structures, a large by-product coke plant, gas mains throughout the City of St. Louis, service lines leading from these mains to the consumers' premises, gas meters, plant equipment such as gas generating and storing machines and appurtenances, and office equipment.

In addition, in the valuation of the property allowance was made for overheads, such as expense of preliminary organization and for

| | Reproduction cost of all property | Part held not used or useful | Part used and useful | Depreciation | Fair Value used and useful |
|---|---|---|---|---|---|
| Land | $ 3,085,020 | $ 1,335,076 | $ 1,749,944 | none | $ 1,749,944 |
| R/W | 6,868 | none | 6,868 | none | 6,868 |
| **TOTAL REAL ESTATE** | $3,091,888 | $ 1,335,076 | $ 1,756,812 | | $ 1,756,812 |
| **STRUCTURAL PROPERTY** | | | | | |
| Buildings, etc. | $ 4,992,805 | $ 946,209 | $ 4,046,596 | | |
| Coke plant | 5,038,529 | none | 5,038,529 | | |
| Mains | 12,026,454 | none | 12,026,454 | | |
| Services | 4,421,769 | none | 4,421,769 | 12% | $27,415,649 |
| Plant and general equipment, meters, etc. | 7,521,544 | 1,900,745 | 5,620,799 | | |
| **TOTAL STRUCTRAL PROPERTY** (Called in Commission's Report $34,000,000) | $34,001,101 | $ 2,846,954 | $31,154,147 | | |
| **GENERAL OVERHEADS** | | | | | |
| 2% for preliminary organization, legal, administrative and misc. exp. | | | $ 623,000 | none | $ 623,000 |
| 4% for enging and superintendence | | | $ 1,014,800 | 12% | $ 893,024 |
| Taxes during construction | | | $ 173,300 | none | $ 173,300 |
| Rent on leased property | | | $ 35,150 | 15% | $ 29,878 |
| Interest during construction | | | $ 2,136,900 | 12% | $ 1,880,472 |
| **TOTAL OVERHEADS** | | | $ 3,983,150 | | $ 3,599,674 |
| **TOTAL OF ALL PROPERTY AND OVERHEADS** | | | $36,894,109 | | $32,772,135 |
| **OTHER ITEMS AND ELEMENTS OF VALUE** | | | | | |
| Material, supplies and working capital | | | | | $ 1,600,000 |
| Additions and betterments to June 30, 1934 | | | | | 161,798 |
| Amount added for upward price trends and going value | | | | | 4,466,067 |
| **GRAND TOTAL FAIR VALUE, Used and Useful Property,** | | | | | $39,000,000 |

legal and administrative services, taxes, interest and other miscellaneous outlays. Further, other elements of value were conceded, such as materials, supplies, working capital, additions and betterments made by the company between July 31, 1933, the valuation date of the appraisal of the Company's properties, and June 30, 1934 (during the hearing before the Commission), together with an allowance for upward price trends during the same period, and an allowance for going value. We shall take up in their order such of these as require discussion.

### REAL ESTATE

1. *Land.* The Company owns fourteen tracts of real estate and leases an office building. The lease did not enter into the valuation as such. Four witnesses appraised the other tracts, two of them, Messrs. J. H. Farish and F. G. Zeibig, being real estate brokers and expert witnesses for the Company, one, M. M. Kinsey, an engineer, being an expert witness for the City, and the fourth, Mr. C. H. Herald, Jr., a real estate broker, having appraised the land as an expert witness for the Commission. The area of these several tracts and the valuations put upon them by the four witnesses and by the Commission in its report, are as follows:

| Station | Area in Acres | COMPANY'S WITNESSES | | CITY WITNESS Kinsey | P. S. C. WITNESS Herald | P. S. C. REPORT |
|---|---|---|---|---|---|---|
| | | Farish | Zeibig | | | |
| A | 12.98 | $ 847,565 | $ 847,565 | $ 536,900 | $ 820,554 | $ 565,044 |
| B | 6.41 | 2,094,260 | 1,747,755 | 1,047,100 | 2,862,155 | 1,501,659 |
| C | 1.41 | 30,634 | 33,686 | 61,600 | 61,651 | 40,000 |
| D | .88 | 9,277 | 11,600 | 11,700 | 14,690 | 11,596 |
| F | .58 | 33,730 | 33,730 | 25,300 | 42,160 | 33,730 |
| G | 3.54 | 77,048 | 77,048 | 50,200 | 77,066 | 62,135 |
| H | 6.08 | 32,971 | 41,214 | 25,800 | 44,693 | 32,971 |
| J | .72 | 15,724 | 15,724 | 17,300 | 31,600 | 15,724 |
| L | 6.54 | 280,609 | 280,609 | 258,700 | 366,192 | 272,954 |
| N | 9.995 | 108,420 | 108,420 | 39,900 | 91,545 | 87,500 |
| Adams Street | .73 | 11,040 | 11,040 | 11,000 | 22,080 | 11,040 |
| Boyle & Papin Streets | .41 | 8,000 | 8,000 | 7,400 | 8,000 | 8,000 |
| Coke Plant | 168.18 | 456,235 | 503,145 | 475,500 | 671,003 | 441,542 |
| Reilly & Espen-Cheid | .24 | 1,125 | 1,125 | 1,900 | 2,250 | 1,125 |
| TOTALS | 218,65 | $4,006,638 | $3,720,662 | $2,570,300 | $5,116,239 | *$3,084,566 |

2. It will be noted the total valuations put upon the real estate by the Company's two witnesses, Farish and Zeibig, respectively, were $4,006,638 and $3,720,662; by the City's witness Kinsey $2,570,300;

*Called in Commissioner's report $3,085,020

and by the Commission's witness Herald $5,116,239. The valuation made by the disinterested Commission's witness is almost exactly twice that of the City's witness. The average of the four valuations is $3,853,460. The valuations by the two company witnesses are much nearer that average. In fact the mean of their two valuations comes within $10,000 of it. The Commission's report fixes the valuation at $3,085,020, which is more than $2,000,000 below that of its own witness Herald and nearly $779,000 less than the average of all the witnesses.

3. This difference (and more) is due to the drastic cuts made by the Commission in the valuation of Stations A and B. On the former both Farish and Zeibig put a value of $847,565, and the Commission's witness Herald a value of $820,554. The figures of the City's witness, Kinsey, for this tract were $536,900, nearly $300,000 under the average of the others, and the Commission's report sets the valuation at $565,044, which is $269,000 less than the mean of the valuations of Farish, Zeibig and Herald. And on Station B Farish's figures are $2,094,260, Zeibig's $1,747,755, the Commission's witness Herald's $2,862,155, and the City witness Kinsey's $1,014,100, which latter is nearly $1,200,000 below the average of the three other valuations on this tract of 6.41 acres. The Commission's report fixes the value at $1,501,659, falling under the above average by $733,300, and reducing the valuations on these two tracts more than $1,000,000 below the mean of all the witnesses except Kinsey.

4. The City's brief argues that the valuations of Farish and Zeibig and mainly those of Herald were mere judgment figures, whereas its witness, Kinsey, had fortified himself by collecting data as to actual, bona fide sales of similar property adjacent to the various tracts involved. The Company, on the other hand, points out that its witnesses Farish and Zeibig had been engaged in the real estate business in the City of St. Louis for forty-two years and fifty years, respectively, and that the Commission's witness Herald had been similarly engaged for fourteen years, whereas the City's witness Kinsey was a civil engineer, had never been a real estate broker, and had no real knowledge or judgment about such matters, but merely collected data from the land records, interviewed grantors and grantees, and based his testimony thereon, although some of these transactions were not *sales* but leases. As against this the City stresses the fact that Kinsey testified he had been engaged extensively in making real estate appraisals for a number of years in St. Louis and various other cities for a number of railroads and for the City of St. Louis, had an intimate knowledge of the appellant Gas Company's properties, and had verified the record data he obtained by talking to the parties concerned.

5. The Commission's report declared Kinsey a qualified wit-

ness, and after discussion of the evidentiary facts arrived at the valuations set out earlier in this opinion. It seems to have cut them to the bone. In saying this we realize the mere averaging of the valuations of the four witnesses does not necessarily give the true value of the land. But when it is remembered that the valuations of the City's witness Kinsey are so much below those of the other witnesses, especially the Commission's witness Herald, we think that result is indicated. Nevertheless that is only a question as to the *weight* of the evidence. The Commission heard all the evidence and saw the witnesses, and we are not warranted in overturning its findings. We agree with the Commission's report that Mr. Kinsey was qualified as an expert to testify on the value of real estate of the kind here involved in the City of St. Louis. Though he was not a real estate broker he was a civil engineer long engaged in real estate valuation work in that city, and his experience was sufficient to furnish a basis for his testimony as an expert. The two cases cited by the Company, Gash v. Mansfield (Mo. App.), 28 S. W. (2d) 127, 132, and Stitzer Hotel Co. v. Beyer, 55 Fed. (2d) 620, 622, are not in point on their facts. The following decisions amply support the Commission's view: Union Elevator Co. v. K. C. Sub. Belt Railroad Co., 135 Mo. 353, 375, 36 S. W. 1071, 1076; Schrodt v. City of St. Joseph, 109 Mo. App. 627, 630, 83 S. W. 543, 544; St. L.-S. W. Ry. Co. v. Hoyt (Mo. App.), 63 S. W. (2d) 214, 216.

6. The Company cites cases holding it was entitled to have its land valued at the fair market value thereof at the time of the hearing, such as Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 53 L. Ed. 382, 399, 29 Sup. Ct. 192, 200. The City asserts the land must be valued at its fair *market* value, and not on the basis of its special adaptability to the Company's particular uses, citing The Minnesota Rate Case, 230 U. S. 352, 451, 57 L. Ed. 1511, 1562-4, 33 Sup. Ct. 729, 961, 48 L. R. A. (N. S.) 1151, 1188, Ann. Cas. 1916A, 18, 48. Both these propositions are correct but they do not, so far as we can see, affect the result in this case. The land was valued in accordance with them.

7. *Allocation of Real Estate.* But while thus finding the value of the Company's 218.65 acres of land to be $3,085,020, the Commissioner's report rejected as not used and useful in the gas business over 81.45 acres thereof, being part in some instances and all in others of eleven of the fourteen tracts. The portion thus excluded represented $1,335,076 of the total valuation, leaving land to the amount of $1,749,944 in the rate base. The omitted land was over 37 per cent of the whole in area and over 43 per cent in value. Some of it was rejected because it was devoted to the generation of electricity or to merchandising, some because it was leased or idle. We can see no valid objection to that. But by far the greater part

thereof was cut out because of supersession. This was done on the following theory. In former times the Company manufactured its gas partly in its by-product coke plant, partly in water gas sets, and partly in coal gas retorts. The coal gas plants, especially, were less efficient than modern equipment and the gas produced by them of lower heating value. Thereafter the Company began to enrich the gas thus produced by the introduction of oil still gas purchased from oil refineries in Illinois near St. Louis. And in 1931 a further advancement was made by the purchase and admixture of natural gas drawn from a pipe line built into St. Louis by another company.

8. The Commission found this evolutionary process in the production of gas had rendered part of the Company's gas manufacturing and storing equipment obsolete and not properly includable in its rate base. This machinery and its appurtenances occupied space in buildings and like structures on the Company's land. To determine what part of the buildings and land should be excluded along with the superseded machinery, the engineers for the Commission calculated the ratio which the area occupied by the rejected machinery bore to the number of square feet of floor space in the building housing it, and deducted that percentage from the value of the building. With reference to the land on which the building stood, they took the number of square feet in that part of the building classified as nonused, and subtracted the value thereof (at the average price per square foot for the land) from the value of the whole tract. In its report the Commission criticized this method of allocating the land saying it withdrew from the value of the whole tract only the value of the space actually occupied by the rejected machinery, and ignored the fact that the whole tract was subservient to the building and the nonused as well as the used machinery thereon. The Commission held that the proportion which the unused portion of the building bore to the used portion should be applied also to the whole underlying tract of land and that a like percentage should be deducted from the value of the latter.

9. The Company vigorously assails this method, calling it a "pock mark theory" which would result in eliminating disconnected bits of land scatteringly over the premises. Attention is called to one instance where a tar well twenty-six feet in diameter on a tract of land was excluded from the rate base. It is pointed out that there is no way of selling or severing this circular area and hole from the tract. So also it is argued that it would sometimes be impossible to do away with a given percentage of a building without removing a portion of the walls and roof and thereby destroying it as a shelter for the useful machinery therein. We think this contention misses the point. The question is not necessarily one of physically severing and withdrawing property even though the whole of it may have

been wisely bought in the first instance. Neither is there, under this topic, a question whether the Company should be compensated for the loss of the property withdrawn. It is solely a question of valuing the property *used and useful* in the gas business for rate-making purposes. And it is obvious that a utility cannot maintain equipment of comparatively small or no useful value on premises unnecessarily large and valuable and demand a return upon the whole. If undissevered parts become useless the legitimate service value of the entire tract is necessarily affected.

10. True enough, it does not always follow that because a machine has become obsolete the space it occupies also becomes useless. The space may still be reasonably and proximately useful in the operation of other needed machinery on the premises. But we understand this judgment factor was taken into consideration. Mr. Brockhoff, engineer for the Commission, testified: "In some cases we use the exact area occupied by a certain piece of equipment, for instance, wells used in the yard. In that case, we use the exact area, however, there may be some equipment inside of buildings, and then we used the proportionate area of that floor space which in our judgment should come out when the equipment comes out." The witnesses for the Company conceded this theory was correct but did not use it because they did not think any of the machinery should be rejected. The Commission adopted the foregoing theory of its engineers as to the buildings and merely extended it to the underlying premises. A determination of whether and to what extent this theory was correct must be deferred until we come to consider the machinery.

11. *Right of Way.* The right of way was valued at $6868 and was allowed to go into the rate base at that figure. There was no controversy about it, and nothing to call for discussion in this opinion.

### STRUCTURAL PROPERTY

12. *Buildings and Allocation Thereof.* The reproduction cost of the buildings and like structures was fixed in the Commission's report at $4,992,805. The valuations of the expert witnesses for both appellants and the Commission were so close to this figure that it can be accepted without discussion as fair. But the Commission cut this valuation $946,209 for buildings and structures which it deemed nonused and useful, leaving $4,046,596 in the rate base. The Company's engineering experts thought substantially all of them should be included. The City's experts contended the reduction should exceed $1,200,000, this being over $275,000 more than the Commission had taken out. The widely divergent views of the Company's experts and the City's experts as to what buildings and like structures should be excluded from the rate base were bottomed mainly on their differences as to what machinery housed therein or appurtenant thereto should be rejected as nonuseful. Again we say a discussion of this

question must be reserved until we take up the allocation of the machinery.

13. *Coke Plant.* The Company's large by-product coke plant was built by the Koppers Company, an eastern corporation which held basic patents on much of the installation. By agreement between the Commission and the Company that concern was employed to appraise the reproduction cost of the plant. The cost so estimated, with a minor deduction agreed upon by the engineers for the Company and the Commission, was $5,497,259. But the City demurred, and after going over the appraisal with a representative of the Koppers Company set its own figure at $4,171,881, a reduction of over $1,300,000. The Commission's report discusses these conflicting appraisals; makes some adjustments, and sets the reproduction cost at $5,038,529. The whole plant was allowed to go into the rate base as of that valuation. There was no allocation of any part of the structural property therein as nonused or useful. We see no ground for interference by this court with the Commission's conclusion.

14. *Mains.* The gas mains throughout the City of St. Louis constituted more than a third of all the Company's constructed property. One of its two experts valued them on a reproduction cost basis at $13,278,960, the other at $12,715,084, and the Commission's engineers at $12,568,759. But the City's expert figured them over $2,000,000 lower, at $10,208,982. There was no substantial disagreement as to the unit cost of the pipe and materials entering into their construction. The differences of opinion arose chiefly over questions: (1) as to how much of the excavation work for their installation could be done with trenching machines and how much would have to be done by hand labor; (2) as to the necessity and expense of excavating "bell holes," these being enlargements of the trenches at the pipe joints to provide room for caulking the joints; (3) as to the amount of hand excavating a laborer reasonably could do in a nine hour day; (4) as to the expense of laying and caulking the mains; (5) and touching the proper allowance for direct overheads on labor and materials.

15. One of the Company's two experts estimated 52 per cent of the linear excavation for mains could be trenched by machinery, the other 64 per cent, and the Commission's engineers 48 per cent. The City's evidence was that 75 per cent of the work could be thus done, but this did not make any allowance for interstitial work at bell holes, water services and minor obstructions, which actually would have to be done by hand, and was based on experience in excavating streets where very little paving had to be cut. The Commission's report considers in detail the evidence and these several estimates, makes necessary computations and adjustments, and arrives at the conclusion that only 45 per cent of the work could be machine trenched.

16. For the bell holes the Commission's engineers figured 22.8 per cent additional excavation, contemplating that at each pipe joint the trench would be dug six inches wider on each side for a linear distance of three feet and deepened nine inches. The City's engineers estimated only 4 per cent, but they allowed nothing for additional lateral excavation at the pipe joints and assumed only that the trench would be dug five or six inches deeper for a distance of about two feet. The Commission's report approved the method recommended by its engineers, but concluded the ditch need not be widened clear to the top. This necessitated a reduction in their percentage from 22.8 per cent to 15 per cent.

17. On the man-hour performance in hand excavation one Company expert estimated 3.4 cubic yards per man per nine hour day, the other 6 yards, the Commission's engineers 4 yards and the City's expert 8.8 yards. But this latter did not allow for the slower work at intersections and in digging past obstructions and the like. The Commission's report allowed 5 cubic yards per man per nine hour day.

18. The City's engineers estimated the cost of laying and caulking mains would be about $300,000 less than figured by the Commission's engineers. But, as the Commission's report observes, there is nothing in the record showing the estimate of the latter needs correction or adjustment, especially in view of the fact that the City's calculations seem to be based largely on experience in laying water pipe where less care is required than in confining poisonous and inflammable gas, and the caulking at joints tends to swell and tighten instead of drying as with gas pipe.

19. On the direct overheads on labor and materials the City's expert again was about $325,000 lower than the Commission's engineers and the Company's expert. The Commission's engineers added a composite percentage of 13.4 per cent for these items but the City's expert allowed only 8.7 per cent, the difference being due to the higher figures estimated by the former for labor overheads. The Commission's report approved the larger percentage used by its engineers, holding that since the City's experts had accepted their estimates for direct labor overheads on all the other property, it would be illogical to reject them for labor on the mains since all these overheads were interrelated.

20. In still another respect (not mentioned above) the city contends the Commission's report was too liberal, by about $300,000, in appraising the reproduction cost of the mains. Most of the gas mains and service pipes were laid in streets which were paved at the time of the installation. The City maintained as a matter of law that the appraisal cost of cutting and replacing this pavement should be figured on the basis of original costs rather than present

day costs. The Commission held to the contrary, but we reserve a discussion of that question for the second and third paragraphs below dealing with the services. All we need say here is that the conclusion reached by the Commission on the several points of difference mentioned above resulted in fixing the reproduction cost of the mains at $12,026,454, which was about $500,000 less than the amount computed by its engineers, and over $1,800,000 more than the City allowed. We approve that finding. All the mains were accepted as used and useful and therefore no questions of allocation arise.

■ 21. *Services.* The reproduction cost of the services running from the gas mains to consumers' premises was estimated by one of the Company's experts at $4,657,200, by the other, Mr. Spooner, at $4,421,269, by the Commission's engineers at $4,923,960, and by the City's expert at $4,149,389. The Commission's report adopted Spooner's figures. The City does not dispute the correctness of his unit prices, but objects to the "inventory quantities" he used—that is the number of feet of services. The Commission's engineers and the City's engineers used one method of computing the number of feet of service pipe and Mr. Spooner another. The report discusses these methods in some detail and reaches the conclusion that Spooner's method was preferable. We are not justified in overturning it.

22. As already stated in the second preceding paragraph, the City also contended as a matter of law that in computing the reproduction cost of mains and services the expense of cutting paving thereover should be figured at original cost rather than present day cost. This contention was bottomed on Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 171-2, 59 L. Ed. 1244, 35 Sup. Ct. 811, P. U. R. 1915D, 577, 589; Worcester El. Lt. Co. v. Attwill, 23 Fed. (2d) 891-892, P. U. R. 1929B, 1, 42-47; Aluminum Goods Mfg. Co. v. Laclede Gas Light Co., 16 Mo. P. S. C. 114, 172.

23. The Des Moines case was dealing with a situation where the streets were unpaved when the gas mains were put in but had been paved thereafter before the valuation date. It was held nothing could be allowed in the appraisal of the reproduction cost for a theoretical cutting and replacement of the paving. In the instant case the streets had been paved before the mains and services were laid, and the pavement was actually cut and restored during their installation. In the Worcester case the amount allowed for pavement thus opened and replaced was the actual, historical cost of the work. In the former Laclede order of the Missouri Public Service Commission last cited above, the decision of the United States Supreme Court in the Des Moines case, supra, was construed to restrict the allowance to original cost. But in Brooklyn Borough Gas Co. v. Prendergast, 16 Fed. (2d) 615, 629, the allowance for such paving work actually done was the present day reconstruction cost;

so, also, in Arkansas Water Co. v. City of Little Rock, P. U. R. 1924C, 73, 100, and apparently in Re Commonwealth ex rel. Rosslyn Gas Co., 3 P. U. R. (N. S.) 61, 73-74. That course was followed by the Missouri Public Service Commission in St. Joseph v. St. Joseph City Water Co. (case No. 6851, p. 54, Aug. 25, 1933). We think it is the correct method. Obviously the original cost of cutting and replacing pavement in the laying of mains and services is not a fair measure of the reproduction cost years later if and insofar as the prices of material, the cost of labor and the conditions of work have changed.

24. *Plant and General Equipment.* The fair value of the Company's plant and general equipment, meters and the like, was appraised by the Commission's engineers at $7,521,544, by the City's expert at substantially the same amount, $7,516,425; by one of the Company's experts, Mr. Spooner, only a little higher, at $7,558,075, and by the Company's other expert, Mr. Lucas, at $8,031,173. But to their figures Spooner and Lucas each added $319,058 for spare parts on hand, and $1,658,765 for Company records compiled through the years, consisting of maps, plats and drawings showing the location of its property under and above ground, and records disclosing in detail its experience in its operations. The Commission adopted the aforesaid valuation recommended by its own engineers of $7,521,544, and made no allowance for spare parts, except such as was included in a separate estimate for material, supplies and working capital, and none for the Company records except such indefinite amount as was included in the allowance for going value. In the statement in its original brief the Company asserts these two items should have been separately inventoried and appraised as a part of its physical property. But the question is not mentioned in the points and authorities or argument in the brief, or in its reply brief. So we dismiss it without discussion.

25. *Allocation of Plant and General Equipment.* The Commission's report rejected property in this class as nonused and useful to the amount of $1,900,745, nearly all of it being gas machinery. In determining how much of the machinery should be classified as used and useful, the Commission considered three things: (1) what the maximum day's consumption of gas would be for a reasonable period in the future; (2) what machinery was fit for use; (3) and the capacity of the available machinery. In approaching these questions it was recognized by all the parties that in furnishing gas to the public for lighting, cooking, heating and other purposes the Company was duty bound to maintain at all times, even on the shortest and coldest days of winter, without notice, a supply of gas adequate to serve consumers' needs, convenience, comfort, health and safety, regardless of whether it could obtain natural gas at the time, and

notwithstanding the amount of machinery necessary at such times of peak demand would be more than sufficient to meet the average or even the average winter demand. In other words some of the machinery is needed only for stand-by and emergency reserve, as in case of a breakdown, stoppage for repairs or maintenance, a failure of the natural gas supply, or unusually cold weather. The Commission further recognized that the Company was bound to anticipate the requirements of the public for a reasonable future period.

26. On the matter of anticipated gas consumption the Commission limited itself to an estimate of the maximum day's demand for manufactured gas which the Company would experience in the year 1935 if its supply of natural gas temporarily failed, and fixed the amount at 270,000 therms, this being the figure proposed by the Company. The year 1935 was arbitrarily picked by the Comission's engineers and the City's experts as a proper test period because it was about two years ahead of the start of the appraisal in 1933. Commission's hearings were held in May, July, August and September, 1934, a mean period only about five months before the test year began. The Company contended, as it does here, that the Commission should have looked into the future as far as 1940 because the appraisal was made at the bottom of the economic depression, better times were returning and business in the new field of house heating gave promise of expansion. In this connection the Company filed an exhibit, No. 29, showing its annual send-out and sales of gas in therms and the maximum day's send-out for ten years before the appraisal, and as estimated by its experts from 1934 to 1940 as follows:

| Year | Send-out | Sales | Peak Day | Year | Send-out | Sales | Peak Day |
|---|---|---|---|---|---|---|---|
| 1923 | 45,793,000 | 42,586,777 | 166,704 | 1932 | 43,969,652 | 42,141,740 | 165,054 |
| 1924 | 47,988,248 | 44,624,638 | 185,328 | 1933 | 43,299,933 | 40,771,142 | 191,258 |
| 1925 | 47,098,310 | 44,570,000 | 180,000 | 1934 | 45,700,000 | 42,457,000 | 210,579 |
| 1926 | 48,357,679 | 45,670,000 | 170,202 | 1935 | 52,019,000 | 48,581,000 | 270,835 |
| 1927 | 48,312,839 | 46,760,000 | 185,532 | 1936 | 60,185,000 | 56,595,000 | 337,741 |
| 1928 | 49,028,312 | 48,130,000 | 186,294 | 1937 | 65,727,000 | 62,063,000 | 402,818 |
| 1929 | 50,108,612 | 48,704,000 | 178,218 | 1938 | 70,869,000 | 67,151,000 | 466,080 |
| 1930 | 47,170,770 | 46,159,000 | 180,234 | 1939 | 75,811,000 | 72,002,000 | 528,460 |
| 1931 | 44,008,059 | 42,351,094 | 150,732 | 1940 | 80,653,000 | 76,777,000 | 590,686 |

27. It will be noticed that the yearly send-out and sales in 1933 when the appraisal was being made were the lowest in eleven years. The exhibit clearly shows they had gradually increased until 1929 and then progressively declined until 1933. From then on the figures are estimates, but there was evidence at the hearing that conditions and prices were trending upward. The law is well settled that it was the duty of the Commission to value the Company's property as of the time of the hearing (rather than the valuation date in the antecedent appraisal), Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 53 L. Ed. 382, 29 Sup. Ct. 192, 48 L. R. A. (N. S.) 1134, 15

Ann. Cas. 1034; and to consider any evidence there presented showing what the consumption of gas would be in the reasonably near future. That proposition is not disputed by any of the parties. But the Commission in its report did accept, in round numbers, the Company's estimate of the maximum day's send-out for 1935 and fixed it at 270,000 therms. Was that sufficient?

28. We are unable to say it was not. The peak day load of 191,258 therms in 1933, when the annual send-out and sales were the lowest in eleven years, was the highest for that same period. And yet the estimated maximum day's outage for the next year, 1934, is increased by the company to 210,579 therms, whereas in 1923 with approximately the same annual send-out and sales the largest day's send-out was only 166,704 therms. (Actually, the peak day in the winter months of 1934 prior to the hearing did not reach the 1933 maximum.) And the estimated peak day's demand for 1935, 270,835 therms, is an increase of more than 60,000 therms over the estimate for 1934, and doubles the variance between any two previous consecutive years shown by the exhibit. From 1936 on the estimates mount by jumps of over 60,000 therms per year. The Commission's report held that the Company's past and then current experience did not justify these liberal estimates of future increases in the maximum day's send-out.

29. It is true that about 1929 the Company began to develop its househeating business; and that gas consumption for that purpose probably will increase more rapidly than for other uses as economic conditions improve. In January, 1934, the Company had 1463 househeating customers, and the testimony of Mr. Brockhoff, the Commission's engineer, was that a gas plant reasonably may expect to sell househeating to 8 per cent or 10 per cent of its customers, which would be 18,000 such services, based on the 180,000 active meters the Company had in 1933. It is also true that as the annual send-out and sales increase the maximum day's demand will increase, other conditions being the same. But, as the Company points out in its brief (on another question) the maximum day's send-out in a year does not bear a fixed ratio to the total send-out for the year. The exhibit plainly indicates this. A few extremely cold days in winter will raise the peak day's demand for the year sharply, whereas unusually moderate temperatures generally throughout the rest of the heating period of the year will lower the total send-out. As a matter of fact the record shows that in 1933, when the annual send-out was the lowest in eleven years but the peak day was the highest, the coldest day in five years occurred. Mr. Brockhoff further said in his testimony before the Commission in 1934 that he made his estimate as of July 31, 1933, when he figured the future demands for gas which would be experienced by the Company in 1935, and he added: "If I were to make it as of today, I would allow more time for the Gas Company to protect its anticipated needs."

30. But considering erratic weather conditions, and the fact that househeating is more or less in an experimental stage in St. Louis, we think the Commission was justified in refusing to go beyond the year 1935 in estimating the future maximum demands for gas which would be made upon the Company's machinery, though it will be the duty of the Commission after service of the mandate of this court to adjust its findings if facts intervening since this cause was brought up for review suggest such a course.

31. Regarding the usefulness and capacity of the machinery. The Commission in its report followed the recommendation of its engineer Mr. Brockhoff, and accepted as used and useful in gas operations the coke plant and its appurtenances, six water gas sets at Station A and two water gas sets at Station B, together with certain purifier and condenser apparatus which its engineers did not include. It excluded two water gas sets at Station A and three water gas sets at Station B with their appurtenances, and also all the coal gas retorts and accessory equipment. The coal gas retorts were not adapted to stand-by emergency service because two or three weeks' time would be required to get them warmed up and started, and they were less efficient. The two omitted water gas sets at Station A were of small capacity, low efficiency and in bad repair, and had not been used by the Company for seventeen years—since 1917. Two of the three rejected sets at Station B, though used, were of similar limited capacity and had been built forty years before, in 1893, and the other one, No. 3, in 1902. This last mentioned set had not been used since 1927.

32. The conclusion reached by the Commission was that the coke plant, the six water gas sets at Station A and the two sets at Station B classified as used and useful had a total daily capacity of 233,000 therms; and that these together with the Company's holders in which gas was stored were sufficient to meet the peak load requirement of 270,000 therms per day. But this was not conceded by the Company's experts who maintained that neither these water gas sets nor the coke plant nor the holders had the effective capacity at which they were rated by the Commission, and that all of the thirteen water gas sets at Stations A and B and the coal gas retorts should be included in the rate base along with the coke plant. On the other hand the City asserted the eight water gas sets at Station A together with the coke plant and holders were sufficient for all emergency purposes, thereby eliminating all the machinery at Station B.

33. As to the capacity of the accepted water gas sets, there was a dispute concerning the number of ''runs'' of gas they could turn out in a day; but they actually had made as many runs as the Commission figured. However, Mr. Brockhoff, the Commission's engineer, admitted all these sets would be needed in an emergency and that if

one of them should break down he would "get down and pray." Then he continued: "More equipment would help, if you had any more good operating equipment. Perhaps they should have more, possibly another water gas set. I would put in an 11-foot set, if I were putting one in. That would be my reserve." This amounts to a concession that the Company was entitled to another good-sized water gas set in its rate base if it had one that was operable. Now, the Company did have one 10-foot water gas set, No. 3, at Station B which was operable, and which was rejected by the Commission. This set, as already stated, was installed in 1902. Whether it would be practical to include it in the operating equipment at Station B along with Sets Nos. 1 and 2, which were retained by the Commission, is an engineering question we are unable to determine, and we therefore leave undisturbed the Commission's conclusion excluding it, especially in view of the implications in Mr. Brockhoff's testimony and the fact that the Company had not used it since 1927.

34. With reference to the capacity of the coke plant the determinative factor was how much oil still gas could be obtained from the refineries in an emergency to enrich its output. The Company's expert took as a basis for his figures on this point a five-day period in February, 1934, when only a comparatively small amount of oil gas was obtainable. The Commission held he should have figured the average daily supply available during the whole of that month. Further, Mr. Brockhoff testified that in case of an extraordinary demand, occasioned by extreme cold weather or the like, the Company need not keep the heating value of its gas up to the standard level of 800 B. T. U., but could furnish gas of any necessary lower heating content that would burn in consumers' appliances—and the Commission seems tacitly to have adopted that view.

35. Finally, concerning the gas holders. It will be remembered the Commission held the Company's useful gas producing machinery has a twenty-four hour capacity of 233,000 therms. The anticipated maximum day's requirement is (or was) 270,000 therms. This leaves 37,000 therms to be supplied by the holders. But the holders merely store gas produced by the machines and do not themselves generate it. Therefore if the daily consumption of gas should exceed the 233,000 therm capacity of the machinery the supply in the holders would finally be exhausted. Mr. Brockhoff testified on cross-examination that this would occur if there were four or five successive days with the temperature ranging about zero. But the Commission held, inferentially, that this was an extreme contingency which need not be taken into account in view of the fact that there was no reasonable likelihood of a concatenation of untoward happenings such as a breakdown of the machinery, failure of the natural gas supply for a period of four or five days, and a spell of

extremely cold weather during the same time. There was, however, undisputed evidence that St. Louis is a place of extreme temperatures and that very cold weather has continued for as long as was hypothesized in the above testimony. This, again, raises a close question of fact on which we must defer to the finding of the Commission. But it is apparent that their report goes to the verge of safety for the gas consuming public and furthermore subjects consumers to the possible necessity of having to use an inferior grade of gas in emergencies, if the assumption is correct that as much as 270,000 therms will be required on peak days.

36. From our conclusion on this issue it follows that the Commission's deduction of $1,900,745, representing nonused and useful plant and general equipment, from the $7,521,544 estimated reproduction cost of the whole thereof, leaving a valuation of $5,620,799 upon the used and useful part of the plant and general equipment, must stand. This makes the reproduction cost of the Company's used and useful structural property $31,154,147, as shown in the table at the beginning of this opinion.

37. It also follows that the Commission's allocation of $1,335,076 of the Company's real estate as nonused and useful, leaving a valuation of $1,749,944 upon the used and useful portion, is upheld. Including this land and the right of way with the structural property, the valuation of the Company's used and useful physical properties (except material and supplies, which will be considered later) totals $32,910,959.

## GENERAL OVERHEADS

38. *Preliminary Organization, etc.* For preliminary organization, legal, administrative and incidental expenses, the Commission's report allowed 2 per cent on the $31,154,147 estimated reproduction cost of the Company's used and useful structural property, making, in round numbers, $623,000. One of the Company's experts advocated an allowance of $2\frac{1}{2}$ per cent and the other $4\frac{1}{2}$ per cent. The City's expert recommended 1 per cent. All of these estimates necessarily were judgment figures. The Company does not complain on this appeal of the Commission's allowance on this item but the City does, asserting that it ascertained the several amounts of money required for these purposes and then determined the percentage, which proved to be 1 per cent. But we concur in the Commission's finding that the City's estimate was too conservative, and approve the Commission's figure.

39. *Engineering and Superintendence.* On this item the Commission's report found that an allowance of 4 per cent was sufficient, eliminating the coke plant on which the Koppers Company had already included $6\frac{1}{2}$ per cent for engineering, in its appraisal, and also excepting furniture and general equipment. On the used and use-

ful structural property this came to $1,014,800. The recommendation of the Commission's engineers was only $66,000 in excess of that figure. The City estimated 3½ per cent but does not complain in its brief of the Commission's finding. The Company, however, does object strenuously. One of its experts used various percentages on various parts of the structural property, the composite percentage being about 6 per cent and the total amount on the used and useful part thereof figuring a little over $1,800,000. The other expert's estimate was a little below $1,800,000. It was also proved that the Commission had usually, in fact recently, allowed 5 per cent as a general overhead for engineering and superintendence. A large number of public utility reports are cited wherein that percentage was used.

40. One of the Commission's engineers, in defending the 4 per cent allowance, stressed as his reasons: that so much of the structural property of the Company—all of the water gas sets—were built by contract and that the engineering work was done by the contractor; and that in theory on a reproduction new cost basis the whole property would be rebuilt as one job and not piecemeal, thereby lowering the engineering outlay. At the same time he admitted the Company's engineers would have to select the machinery purchased, determine where it should be installed, and see that the contract was performed; and that all reproduction cost appraisals proceed on the theory of rebuilding all the property new as one project. He further said the Company's property was good and well built, and that he was informed it was rendering good service. He conceded 5 per cent was a common allowance and added: "I think that it could be adopted down here."

41. The other expert gave as his reason for allowing only 4 per cent for engineering that a considerable part of the construction work on the Company's property, such as the installation of the mains, services and meters, does not require as much engineering work as would the installation of complicated machinery. That fact is emphasized by the Commission in its report. He also said the 6½ per cent overhead for engineering and superintendence which the Koppers Company included in the appraisal of the coke plant would bring up the average for all the structural property to 4½ per cent. But that statement was based on figures of engineers for the Commission·which the Commission did not accept. On the Commission's valuation of $31,154,147 for the used and useful structural property, less $745,128 for furniture and general equipment excluded, the addition of the $280,750 overhead for engineering allowed by the Koppers appraisal would still leave the composite percentage below 4¼ per cent.

42. This witness could recall only one case where less than 4 per cent had been allowed, and that was in the building of a small plant in Parsons, Kansas. In the St. Joseph City Water Company

case, supra, No. 6851, pp. 28, 59, the Commission's engineers and the Company's engineers agreed a proper overhead allowance for engineering and superintendence was 4.95 per cent and the Commission so found. In that case nearly 56 per cent of all the water Company's structural property consisted of mains, services and meters; and these were for water service—not gas service, where a greater degree of care is required to confine the poisonous and inflammable gas as has already been pointed out. That report and order were made on August 25, 1933, while the appraisal in the instant case was going on. We think the allowance of only 4 per cent for engineering and superintendence was inadequate. On the basis of a 5 per cent allowance this would make a difference of about $253,700 in favor of the Company.

43. *Taxes During Construction.* All the parties assumed it would take at least two calendar years to reproduce the Company's gas properties and that June 1, the annual assessment date under Section 9746, Revised Statutes 1929 (Mo. Stat. Ann., p. 7867), would twice occur during that period. This time estimate was adopted by the Commission. The calculations of the Company's two experts, adjusted to cover only the property which the Commission accepted as used and useful, would fix the amount of the taxes at about $687,000 for one, and about $530,000 for the other. On the same basis the figures of the Commission's engineers would be about $456,000. The City's estimate for these taxes was $155,000, computed on its valuation of the property it conceded should go into the rate base.

44. The Commission's allowance for taxes during construction was $173,000. Its report contains a seven-page discussion of this item. All property subject only to manufacturers' and merchants' tax was excluded because that tax would not be assessed until the plant began operations. Automobiles, furniture and fixtures, cash, materials and supplies also were excluded on the theory that they do not become a part of the set-up until the end of the construction period. This left subject to taxation only land, structures, holders, mains, services and meters. But inasmuch as all of these except the land were worn or depreciated to a then condition 88 per cent of new (as we shall presently see) and the taxes at the time of the appraisal were based on that condition; and since on reproduction the property would be new and would be assessed at its consequent greater value; therefore the Commission assumed the tax assessment on the property reproduced new would bear the same ratio to the then current assessment as the cost of reproduction new bore to the reproduction cost less depreciation, or, in other words, to its value in its then depreciated condition. This resulted in an increase of about 13.64 per cent in the then existing tax assessment on the above structural property.

45. But the Commission went further. Presumably because the

valuation date fixed for the appraisal was July 31, 1933, the report assumed the two-year period allowed for reconstructing the property would begin on August 1, 1933. This being true, the first statutory assessment date thereafter, June 1, 1934, would follow in ten months, at which time theoretically ten months construction work, or 10/24 of the whole, would have been done. The taxes on this part would be finally due under Section 9936, Revised Statutes 1929 (Mo. Stat. Ann., p. 7981), on December 31 of the next year, 1935. But five months earlier on July 31, 1935, the assumed two-year construction period would have ended, so that the plant would be completed and commencing operations five months before tax paying time. On this theory the Commission held with respect to the taxes falling due in the year 1935 that five-twelfths of them should be regarded as operating expense, and that only seven-twelfths should be included in the rate base.

46. The remaining 14/24th of the construction work would be done between the first assessment date, June 1, 1934, and the expiration of the assumed two-year construction period on July 31, 1935; and the second statutory assessment date, June 1, 1935, would come two months before the period ended. But the taxes based on this second assessment would not be due until December 31, 1936, seventeen months after the plant had been in operation. The Commission held no part of these taxes could be allocated to construction and that they must be charged wholly to operation. All of the foregoing resulted in admitting into the rate base only 30.7 per cent of the taxes accruing on the reproduced property during construction.

47. We think this was not an equitable disposition of the matter. *All* the taxes (except for the final two months' construction work) would be assessed before the expiration of the assumed two-year construction period; *none* of them would be due until after it expired. And yet the Commission did not treat them all alike. It singled out seven-twelfths of the taxes maturing in 1935 and charged them to construction because seven months of that year would have elapsed before the plant was in operation. The rest of the taxes for the entire construction period are excluded.

48. Why pick out the calendar year 1935 and allocate to construction only a fractional part of the taxes maturing that year representing the portion of the year before the plant was in operation? We can see only one colorable reason for it, and that would be on the theory that the taxes falling due each year are to be considered a charge against the operating revenues for that year regardless of when they became a liability. That plan might work out reasonably well after the plant had become a going concern and the earnings of each successive year could be utilized to pay taxes incurred the year before. It seems to have been the Commission's theory, for the report

says its computation is "in accordance with the practice of the La-
clede Company." But such a practice cannot fairly be applied to an
assumed reproduction new. The utility would be just starting out.
During the two years of construction the taxes would be running and
attached to the property as a liability but the plant would not be
earning anything. As a matter of fact many construction costs,
though concededly chargeable to the capital account, actually might
not be paid until after the operations began. In the instant case
nearly 70 per cent of these taxes are left to be discharged out of earn-
ings paid by consumers, though the plant was not ready to give service
while they were accruing. They certainly were a capital outlay, and
should be charged either to construction or to working capital. The
Commission's accountants Messrs. Ross and Roberts testified they
should be included in the construction account. If that had been done
the account would have been increased about $600,000, the Company's
brief says.

49. *Rent on Leased Property.* The Company had a ninety-nine
year lease on the ground on which its office building stands. The Com-
mission conceded that on a reconstruction of its properties the Com-
pany as a part of its overhead expense would have to pay rent on this
land, and would be entitled to interest on such payments to the end
of the two year construction period, and also to credit for taxes paid.
These were allowed in the aggregate sum of $35,150, and there is no
controversy about it.

50. *Interest during Construction.* For interest on funds used
during the assumed two-year period of reconstruction the Commission
allowed $2,136,900, this being on a 6 per cent basis. The Company's
experts estimated a greater amount because they used a higher interest
rate. However, the Company in its brief does not seriously complain
of the Commission's allowance. The City's expert contended 5 per
cent would be a proper interest rate, but the City's brief does not
elaborate on that contention. We pass it without further discussion.

51. *Summary as to Physical Property and General Overheads.* As
shown thus far, the valuation put by the Commission on the Company's
used and useful land was $1,749,944; on right of way, $6,868; and
on structural property, $31,154,147. The aggregate allowed by the
Commission for general overheads was $3,983,150, making the total for
physical property and overheads, $36,894,109. But, as pointed out
in the last few paragraphs, the Commission's allowance for engineer-
ing and superintending was inadequate about $253,700, though we do
not attempt to determine the precise percentage or amount by which
it should be increased. Also, as we have just held, the allowance for
taxes during construction should be increased—the Company contends
as much as $600,000.

## ACCRUED DEPRECIATION.

52. Not only did the Commission's report reject a part of the Company's property as not used or useful; it also scaled down its valuation of the part which was admitted into the rate base on the theory that it had depreciated in value. This depreciation was estimated in percentages, first applying such separate percentages to separate classes or items of property as seemed justified by inspection, experience, history and performance, and then determining the composite percentage for the whole. The cost of reproduction new reduced by this latter percentage was taken as evidence of the value of the used and useful property in its condition on the valuation date.

53. It was conceded by all parties that land and working capital should not be depreciated, and they were not. The Company's two experts did not depreciate the general overheads; the City's expert did; and the Commission's engineers also depreciated all the general overheads, save the item for preliminary organization, legal, administrative and miscellaneous expenses. The Commission in its report followed the same plan except that it further exempted from depreciation the item for taxes during construction. All the parties conceded the structural property should be depreciated, but disagreed as to the amount. In ascertaining the proper percentage of depreciation five questions seem to be involved: (1) how much had the structural property depreciated; (2) in estimating that depreciation should we consider only wear and tear, deterioration and generally speaking, diminishment in value from use, or should age, obsolescence and other factors independent of use also be considered; (3) should all the general overheads as well as the structural property be depreciated; (4) in fixing the rate base should accrued depreciation be deducted from original, historical cost, or from the current cost of reproduction new; (5) and should the cost of reproduction be reduced by the percentage of depreciation, regardless of the fact that the Company has not through the years built up a depreciation reserve out of earnings large enough to offset the accrued depreciation. We take up these questions in their order.

54. The Commission in its report found that the composite percentage reflecting the condition of the structural property was 88 per cent, meaning it had depreciated 12 per cent from new. Reducing by that percentage the $31,154,147 valuation which the report had placed on the used and useful structural property reproduced new, gave $27,415,649 as the value of the property on the valuation date, July 31, 1933. The report states the Commission reached that conclusion in part from a consideration of Exhibit 83, offered in evidence at the hearing, which shows the composite condition percentages estimated by the Commission's engineers and the experts for the Company and the City.

954

55. The report attempts to set out those percentages, as they appear in the first column of the table below. However, the figures thus set out are not as they actually appear in the exhibit. The exhibit figures are correctly shown in the second column of the table below though there is not a great deal of difference between the two columns. But the City's brief points out that neither the Commission's figures nor the exhibit figures are correct because both sets are computed on footings which include *valuations of the land and right of way, spare parts and records,* and not valuations of the structural property alone. Neither the land nor right of way are subject to depreciation, and the spare parts and records were not admitted by the Commission into the rate base at all as separate items. The inclusion of the estimates for these items in the footings had the effect of increasing the condition percentages. The figures showing the true percentages, with the four items eliminated, as given in the City's brief, appear in the third column of the table below:

|  | Commission's report | Exhibit 83 | City's brief |
|---|---|---|---|
| Commission Engineers | 84.8% | 85% | 82.9% |
| First Company Expert | 89.8 | 89.7 | 88.2 |
| Second Company Expert | 90.2 | 90.4 | 88.9 |
| City's Expert | 81.3 | 81.1 | 79.4 |
| Average . . . . . . | 86.525 | 86.55 | 84.85 |

56. An examination of Exhibit 83 shows the City's contention is correct, and the question therefore arises as to how the Commission's finding should be adjusted in view of that fact. It will be seen that the first column of figures in the above table, mistakenly shown in the Commission's report as having been taken from Exhibit 83, averages 86.525 per cent. But the Commission's report says it considered not only the several percentages making that average, but also "the reasons offered in support of each." As a result of that the Commission concluded the proper figure representing the composite percentage condition of the structural property was 88 per cent instead of 86.525 per cent. In other words the Commission's finding increased the above average by 1.7 per cent thereof. Applying the same percentage of increase to the 84.85 per cent average of the various engineers' estimates shown in the third column of the above table according with the the City's contention, would give 86.3 per cent as the true figure representing the condition of the structural property on the valuation date, which would mean that the depreciation has been 13.7 per cent instead of 12 per cent as found by the Commission. From this it follows that the reproduction less depreciation value of the used and useful structural property, amounting to $27,415,649 under the Commission's report, should be lowered to $26,886,029.

57. The City asserts in its brief that the investigation made by its experts to determine the condition of the Company's property was more thorough and their knowledge of the history of the property was more extensive than that of the Company's and Commission's experts. The Commission's report says the different conclusions reached by the several experts were due primarily to differences of opinion rather than to differences in the principle or method of determining the depreciation. That appears to us, also, to be true. Most of the figures on the accrued depreciation given by the various engineers were judgment figures, and generally they inclined toward the side of the case with which the witness was aligned. There are, however, some instances where the City's experts were less thorough than the other experts; as, for instance, in estimating the accrued depreciation on the mains, where the City's expert made no attempt to base his conclusions on actual inspection. We think the Commission made no mistake in taking the view of the evidence that it did.

58. The City also maintains that in estimating the accrued depreciation, obsolescence, inadequacy and other like factors independent of actual use, wear and tear, should be taken into consideration. We do not understand that the Company disputes that proposition. At any rate it is well established by the precedents such as Dept. of Public Works v. Seattle Gas Co. (Wash.), 3 P. U. R. (N. S.) 433, 464, where it is said accrued depreciation is the "portion of the useful service life which has expired;" and Lindheimer v. Ill. Bell Tel. Co., 292 U. S. 151, 167, 78 L. Ed. 1182, 1192, 54 Sup. Ct. 658, 664, 3 P. U. R. (N. S.) 337, 347, in which the term is defined as follows: "Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence."

59. But it is further contended by the City that the Company's two experts did not consider inadequacy and obsolescence in estimating the accrued depreciation, and that the Commission did not do so in its report. In this the City is mistaken. As already stated, the Commission did not restrict itself to a consideration alone of the several condition percentages purportedly estimated by the Company's, the City's, and the Commission's experts as set out in its report, but also took into account "the reasons offered in support of each." The Commission's engineers and the City's experts expressly testified that they included obsolescence and inadequacy in making their estimates. And so did both the Company's experts when the obsolescence "is fully consummated" and the inadequacy "is evident," as one of them said, or when such obsolescence and inadequacy "have accrued in fact," as the other one states. Apparently they did not go as far as the other experts, and meant by this that

accrued depreciation should not be charged against any item of property on account of obsolescence or inadequacy unless and until it is actually retired from service for that reason (see discussion of de-. preciation of overheads in second paragraph below). But the Commission did not follow that theory, and we think its report is unexceptionable on the grounds here assigned.

60. The Commission's report, as we have said, also depreciated all the general overheads except the item of preliminary organization, administration, legal and miscellaneous expenses, and the item for taxes during construction. The theory on which the general overheads were depreciated was that they really would be a part of the cost of reproducing the property and each item thereof new, and should be depreciated like the labor or material cost or any other element entering into the outlay for replacing the property. The theory on which preliminary organization, etc., and taxes were not depreciated was that while there may have been expenditures for these when the property was built, yet they would not occur again on reproduction anew.

61. The Company contends none of the general overheads should have been depreciated. The theory of its experts was that general overheads attach to the property as a whole when it is built or reproduced and represent services and expenses incurred in creating the entire project and making its separate minor parts coordinate with each other in one unit; that these overheads bear no direct relation to the individual parts of the plant severally; and that so long as a given piece of machinery or other like chattel (no matter how much it may have deteriorated) remains an integral part of the plant and is giving service the general overheads should not be depreciated on account thereof, this being done only when a substantial item of property is actually retired from service. The decisions relied upon to support this view are Galveston Electric Co. v. City of Galveston, 272 Fed. 147, 168, P. U. R. 1921D, 547, 577; Id., 258 U. S. 388, 398-9, 66 L. Ed. 678, 42 Sup. Ct. 351, P. U. R. 1922D, 159, 168.

62. We think these cases are not authority for the Company's contention. They do not deal with questions of *accrued* depreciation, but discuss the matter of allowing an annual deduction from revenues to create a depreciation reserve covering *future* depreciation. There are many precedents holding general overheads should be depreciated along with the property itself, because they enter into the cost thereof and therefore of each unit making up the whole. [See City of Winona v. Wisconsin-Minn. Light & Power Co., 276 Fed. 996, 1004; Re West St. Louis Water & Light Co., P. U. R. 1922E, 805, 826, and authorities there cited.] Indeed, there is some reason for doubting the correctness of the Commission's order in this case exempting from

accrued depreciation charges the general overheads for preliminary organization and taxes; but we leave it undisturbed for the reasons given by the Commission.

63. We should add that in depreciating the general overheads for engineering and superintendence and for interest during construction the Commission estimated the accrued depreciation on the same basis as for the structural property. Inasmuch as we have held the accrued depreciation on the structural property should have been figured at 13.7 per cent instead of 12 per cent, therefore the same should be done with these overheads. The effect of these changes on the total footings will be stated presently. The general overhead for rent, interest and taxes on the leased office building was depreciated by the Commission 15 per cent and is not questioned.

[18] 64. The City makes the point that "accrued depreciation should be deducted from *original* cost in ascertaining the rate base, because it is the property, and not the cost thereof, which is depreciated, just as it is the value of the property, and not the cost thereof, that may not be confiscated." (Italics ours.) In support of this rather abstract contention rulings of Commissions and court decisions are cited which do not sustain it. The object of the inquiry is to find the fair value of the Company's property for the purpose of fixing a rate base. In doing that both the original cost of the property and the present cost of reproduction should be considered. [Dayton Power & Light Co. v. Pub. Util. Co., 292 U. S. 290, 310, 78 L. Ed. 1267, 1281, 54 Sup. Ct. 647, 657, 3 P. U. R. (N. S.) 279, 294; Los Angeles Gas & Elec. Corp. v. Railroad Comm., 289 U. S. 287, 307, 77 L. Ed. 1180, 53 Sup. Ct. 637, P. U. R. 1933C, 229, 242; The Minnesota Rate cases, supra, 230 U. S. 1. c. 452, 57 L. Ed. 1. c. 1563, 33 Sup. Ct. 1. c. 761, 48 L. R. A. (N. S.) 1. c. 1188, Ann. Cas. 1916A, 1. c. 49.] From the fair value of the property new, as thus ascertained, the amount of accrued depreciation (usually estimated in percentages as in the present case) is deducted. There is no more reason for saying that deduction should be made only from the original, historical cost than there is for saying the fair value new should be determined only on that basis. We rule this contention against the City.

65. Finally, the Company urges that the cost of its property new should not be reduced by the amount of accrued depreciation because its depreciation reserve built up through the years out of earnings is not large enough to cover it. And it asserts that if this claim be denied, then it should be permitted to amortize the depreciated or discarded property for which it stands uncompensated. These contentions are so closely related to the issues respecting rates and the annual allowance for depreciation that we reserve our discussion of them until we come to the latter issues.

## OTHER ELEMENTS OF VALUE

■ 66. *Materials, Supplies and Working Capital.* The Commission's engineers estimated that the Company requires in the operation of its gas property $600,000 cash working capital and $804,517 in material and supplies, and therefore recommended an allowance of $1,404,517 for these purposes. This did not include anything for taxes which would become a liability during reconstruction new but would not accrue until after operations began. One of the Company's experts testified the amount needed would be $2,000,000; the other said $2,278,848. Mr. White, vice president of the Company, stated the requirement for cash working capital alone in 1935 would be $1,549,717. The figure given by the City's expert was $1,204,517. After discussion of these five estimates and pointing out certain errors in them the Commission report fixed the allowance at $1,600,000. We affirm that finding, contingent upon the making of a proper allowance for taxes during construction in the construction account.

67. *Additions and Betterments.* The total net additions to the Company's gas plant from the valuation date, July 31, 1933, to June 30, 1934, during the hearing, was $161,798. There is no controversy about that.

68. *Upward Price Trends and Going Value.* Recapitulating the changes we have made in the allowances authorized by the Commission's report and set out in the table at the beginning of this opinion, showing the fair value of the Company's used and useful gas properties. Increasing the accrued depreciation on the structural property from 12 per cent to 13.7 per cent results in lowering the Commission's valuation of $27,415,649 to $26,886,029, a reduction of $529,620. The Commission allowed a 4 per cent general overhead for engineering and superintendence amounting to $1,014,800. We have held earlier in the opinion that on the basis of the facts in the record this overhead should be increased from 4 per cent to about 5 per cent, which would add $253,700 thereto. But we have also increased the accrued depreciation on this allowance from 12 per cent to 13.7 per cent, which, on the above basis, would make a net difference of $201,691 in favor of the Company. We have also increased the Commission's $173,300 allowance for taxes during construction by about $600,000. But both these holdings are based on statements in the Company's brief. They are tentative and for the purpose of illustration, and are subject to further examination by the Commission upon the remanding of the cause. We have further increased the accrued depreciation on the Commission's overhead allowance of $2,136,900 for interest during construction, from 12 per cent to 13.7 per cent which results in a decrease of $36,327 in that item. The several estimates based on the Commission's report and those authorized by this opinion are shown more in detail in parallel columns in the table

following. The changes made by us affect by less than $236,000 the Commission's finding that the fair value at the time of the hearing of the Company's property used and useful in gas operations was $39,000,000; and they fix the amount allowed by the Commission (though it stated no figure in its report) for upward price trends and going value at about $4,500,000. The table is as follows:

|  | Comm's. Report | This Opinion |
|---|---|---|
| Land | $ 1,749,944 | $ 1,749,944 |
| Right of Way | 6,868 | 6,868 |
| Structural Property | 27,415,649 | 26,886,029 |
| Preliminary Organization | 623,000 | 623,000 |
| Engineering and Supt. | 893,024 | 1,094,715 |
| Taxes during const. | 173,300 | 773,300 |
| Rent, etc., leased prop. | 29,878 | 29,878 |
| Interest during const. | 1,880,472 | 1,844,145 |
| Working capital, etc. | 1,600,000 | 1,600,000 |
| Additions | 161,798 | 161,798 |
| Price trends, going value | 4,466,067 | 4,466,067 |
| Fair Value | $39,000,000 | $39,235,744 |

69. The Commission's finding of fair value showing it considered price trends and going value, was as follows:

"Having given careful consideration to the fair market value of land, the estimated investment, cost of reproduction and cost of reproduction less depreciation of the property used and useful at the present time in serving the consumers in St. Louis, the requirements to serve these consumers for a reasonable period in the future the proper allowance for general overheads, the trend in construction costs, the working capital, both cash and materials and supplies, the additions and betterments to June 30, 1934, and all intangible elements of value inherent in this property treated as a going-concern with its business attached, necessary records and trained personnel, we are of the opinion that the present fair value of the property used and useful is $39,000,000.00."

70. The law is well settled that in determining the value of the Company's property the Commission was bound not only to consider prices and wages prevailing at the time of the investigation but also to make an honest and intelligent forecast as to the probable price and wage levels during a reasonable period in the immediate future so far as discernible. [McCardle v. Indianapolis Water Co., 272 U. S. 400, 410, 71 L. Ed. 316, 324, 47 Sup. Ct. 144, 148.] There was evidence for the Company that between July 31, 1933, and June 1, 1934, material prices had so increased that the reproduction cost of the property was 8.6 per cent higher. The City's expert conceded

there had been a rise in prices of 5.3 per cent, but he said it might be only a normal fluctuation. There was also evidence that the purchasing power of a dollar had dropped. Undoubtedly there was substantial evidence justifying an allowance of from $1,500,000 to $2,000,000 on this account.

71. Speaking of going value the United States Supreme Court said in Los Angeles Gas & Elec. Corp. v. Railroad Comm., supra, 289 U. S. l. c. 313, 77 L. Ed. l. c. 1180, 53 Sup. Ct. l. c. 637, P. U. R. 1933C, 229: "This court has declared it to be self-evident 'that there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced.'" In Dayton Power & Light Co. v. Publ. Util. Comm., supra, 292 U. S. l. c. 308-9, 310, 78 L. Ed. l. c. 1279-80, 1281, 54 Sup. Ct. l. c. 655-6, 3 P. U. R. (N. S.) l. c. 292-3, 294, the court observed that going value, when it exists, may have a place in the base upon which utility rates are computed, though it is not something to be read into every balance sheet as a perfunctory addition.

72. The appellant Company has extensive gas generating, storing and distributing equipment, some new and some old, which the Commission found to be worth over $34,500,000, independent of price trends and going value. It and its predecessors have been operating since 1857 in St. Louis, a thriving city of more than 800,000 population, and it now exclusively occupies that field in gas service. In 1933, the last year before the appraisal started and during the lowest period of economic depression, it had over 180,000 meters in service and nearly 31,000 additional meters connected on customers' premises but not in service. When the properties of the Company were valued by the Commission in 1926 in Aluminum Goods Mfg. Co. v. Laclede Gas Light Co., supra, 16 Mo. P. S. C. 114, 196, the going value was fixed at $5,818,000; and the Commission adhered to that valuation when the question came before it again In re Laclede Gas Light Co., 17 Mo. P. S. C. 206, 222. On a review of that order in State ex rel. City of St. Louis v. Pub. Serv. Comm., 329 Mo. 918, 946, 47 S. W. (2d.) 102, 114, this court criticized the allowance and said the Commission should find it to be "appreciably less." One of the Company's experts in the present case testified $5,000,000 would be a fair allowance for going value, and the other said $6,000,000.

73. The City in its brief "takes the position that all elements of value have been reflected when the property devoted to the public service is valued as used and useful, coordinated property in a gas system and not as isolated, unrelated pieces of equipment and property which are not part of a used and usable whole." It also argues that "no additional consideration or specific allowance for going value should be included in the rate base when the property has been valued, not as scrap, but as a functioning, coordinated plant in suc-

cessful operation, and when there have been included all proper overheads and working capital, plus, in this case, $1,000,000 for consolidation. Especially is this so when all claimed costs and expenditures have been charged to operation."

74. The City does not point out wherein $1,000,000 has been allowed in this case for consolidation and it does not appear in any of the figures from which we have taken the table set out at the beginning of this opinion. Neither is there anything to show that "all claimed costs and expenditures, have been charged to operation." Of course, it is true that where the physical property has been appraised as an assembled plant doing business and earning money, no additional allowance should be added for going value because it is already included. This was held in Columbus Gas & Fuel Co. v. Pub. Util. Comm., 292 U. S. 398, 411, 78 L. Ed. 1327, 1335, 54 Sup. Ct. 763, 4 P. U. R. (N. S.) 152, 161, where the United States Supreme Court said "the record justifies a holding that it (going value) was reflected in the other items and particularly in the appraisal of the physical assets as a part of an assembled whole," citing Hardin-Wyandot Lighting Co. v. Pub. Util. Comm., 118 Ohio St. 592, 603, P. U. R. 1928D, 560, 162 N. E. 263. The City attaches significance to the fact that the Supreme Court of the United States in the above quotation cited this Ohio case because there the Ohio Supreme Court was construing Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 171, 59 L. Ed. 1244, 35 Sup. Ct. 811, P. U. R. 1915D, 577, and pointed out that in the Des Moines case the plant of the utility involved was valued, "not upon the mere salvage value of its separate units, but was given a valuation based upon the reproduction cost of the whole new, less existing depreciation of the complete plant, together with additions for organization, interest, engineering, law expenditures, taxes, and general expenses during construction, and contingencies and omissions."

75. We do not understand that the United States Supreme Court in the Columbus Gas & Fuel Co. case said, or intended to say, that going value would not be allowed in the valuation of a utility for rate-making purposes unless the physical plant had been valued only as junk or salvage. For in Denver v. Denver Union Water Co., 246 U. S. 178, 191, 192, 62 L. Ed. 649, 661, 38 Sup. Ct. 278, 282, 283, the same court said: "It involves a practical contradiction of terms to say that property useful and actually used in a public service is not to be estimated as having the value of property in use, but is to be reckoned with on the basis of its 'junk value.'" And in that case the court went on further to say: "In the present case, the master expressly declared that his detailed valuation of the physical property and water rights included no increment because the property constituted an assembled and established plant, doing business and

earning money." A plant might be valued as used and useful property with the allowance of all proper direct and general overheads, and still not be doing business and earning money.

76. In the instant case the Commission's engineer Mr. Roberts expressly declared that in appraising the physical property no allowance was made for going value. He said:

"In our prices we have taken the actual labor, actual cost of material in the plant, all that sort of thing, the actual expenditures by way of general overheads, and added them together for the final answer. There is no allowance in them for any other item. I did not consider it to be a part of the engineer's job to determine 'going value.' Our instructions are to give no consideration to 'going value.' We give no allowance for it, and submit no report on it."

From this it follows that the City errs in contending going value had already been included in the valuation of the physical property. An estimate of from $1,500,000 to $2,000,000 for price trends being justified, as we have already held, this leaves out of the $4,466,067 allowed for intangibles about $2,500,000 to $3,000,000 to be charged to going value. Without doubt these two items together amply warrant the Commission's finding.

## REASONABLE RETURN

77. *Annual Depreciation Allowance.* The Commission's report and order authorized and directed the company to collect and set aside as an annual allowance for depreciation the sum of $500,000, stating it amounted to 1½ per cent of the cost of reproduction of the Company's depreciable gas property; and also a like percentage of the cost of additions and betterments subsequent to June 30, 1934, all these prior to that date having been included in the appraisal. If $500,000 is 1½ per cent of the cost of the depreciable property then the whole cost thereof would be $33,333,333. The depreciable property includes the used and useful structural property with all depreciable general overheads thereon, and excludes the land and right of way. The Commission evidently has made a very liberal aproximation, since this property totals $34,502,795 (nearly $1,200,000 more than the $33,333,333 on which the percentage was figured) and 1½ per cent thereof would be $517,542, which is $17,542 per year more than the Commission allowed.

78. The Commission arrived at the annual allowance of 1½ per cent on the theory that in its former valuation it made a like percentage allowance (17 Mo. P. S. C. 1. c. 223) and found the amount in the Company's depreciation reserve, as of December 31, 1927, to be $2,500,782. In the instant appraisal the Commission's accountants adjusted that reserve by figuring it up to September 30, 1933, at the same percentage on the *investment* cost of the depreciable property and found the reserve had increased $344,000 in round numbers.

This investment cost, as we figure it, would be $33,192,860.50, less $1,715,522.50 for land, making about $31,480,000. The Commission reasoned that if this annual allowance of 1½ per cent on the investment cost of the property would thus adequately provide for annual replacement requirements then the same percentage on the *reproduction* cost of the same property would be amply sufficient. But it will be observed the $500,000 annual allowance actually is based on a valuation about half way between the investment cost and the reproduction cost. It should be based on fair value, not original cost. [United Rys. & Electric Co. v. West, 280 U. S. 234, 253, 74 L. Ed. 390, 410, 50 Sup. Ct. 123, 126.]

79. The City's expert asserted the annual depreciation allowance should not exceed $400,000 and said he based his estimate on a study of the Company's actual experience in making retirements of its gas property over the preceding ten years. In its brief the City also assails the Company for inconsistency in contending the *accrued* depreciation (which must be deducted from the rate base) is low, and at the same time asking for a high annual allowance for *current* and *future* depreciation (which is included in the rates collected from consumers). It is pointed out that when the case was here before, 329 Mo. l. c. 939, 47 S. W. (2d) l. c. 110, this court stressed the holding in the dissenting opinion of Commissioner CALFEE that there is an obvious relation between accrued depreciation and the annual depreciation allowance.

80. But so far as that is concerned the City is guilty of the same inconsistency, for it is claiming the accrued depreciation is high and that the annual depreciation allowance should be low. Furthermore, while it is perhaps true that there is some connection between the two, and that past experience is generally the best guide (except as to obsolescence) yet there is a difference. When a new piece of equipment is installed in a plant the observable depreciation is not uniform. It will continue in service for a considerable time without apparent deterioration and then toward the end of its life breakdowns and repairs occur more frequently until it has to be retired. On the other hand the annual allowance for depreciation is anticipatory and runs along the same each year until at the end of the useful life of the property the cost or value thereof will have been absorbed. As was said in Clark's Ferry Bridge Co. v. Pub. Serv. Comm., 291 U. S. 227, 239, 78 L. Ed. 767, 794, 54 Sup. Ct. 427, 431, 2 P. U. R. (N. S.) 225, 231, "it is recognized that accrued depreciation, as it may be observed and estimated at a given time, and an appropriate allowance of depreciation, according to good accounting practice, need not be the same."

81. Looking at the other side of the question. One of the Company's experts testified the annual allowance for depreciation should

be 2.22 per cent, coming to $744,725, and the other fixed the amount at $750,000. These estimates were bottomed, of course, on their theories as to the valuation of the property, the part that should be included in the rate base, the rate of depreciation and the parts that were depreciable. In its brief, the Company cites numerous orders of the Commission in other cases allowing a higher percentage for the depreciation annuity. These ranged as high as 3½ per cent but almost all were for small companies. In the Kansas City Gas Co. case, 14 Mo. P. S. C. 312, and the Springfield Gas & Elec. Co. case, P. U. R. 1924A, 613, the allowance was 2 per cent. In Fort Worth Gas Co. v. City of Fort Worth, 35 Fed. (2d) 743, the United States District Court for the Northern District of Texas held the allowance should be 4 per cent. In Wichita Gas Co. v. Pub. Serv. Comm., 126 Kan. 220, 268 Pac. 111, P. U. R. 1928D, 124, the Kansas Supreme Court affirmed an allowance of 3 per cent. These citations show the allowance varies with the facts of the case. The Commission has twice held on substantial evidence that 1½ per cent is sufficient for the appellant company and we are not warranted in overturning that finding.

82. However, there was evidence for the Company that for seven or eight years up to 1929, before it had any substantial householding business, its gas sales gradually increased and amounted to more than they did in 1933. The table shown in paragraph 26 of this opinion shows that fact. In view of that increasing business the Company added about $9,000,000 in new equipment between 1925 and the time of the hearing, mostly before it began to use natural gas in 1931. It was also proven that with the advent of this new heating element changes were necessarily made in customers' appliances at a cost of $500,000, $425,000 of which had not been amortized at the time of the hearing. The further fact was undisputed that after the Company began to mix natural gas in its output and increased the heating content thereof from 600 B. T. U. to 800 B. T. U., it reduced its rates over $600,000 per year pursuant to an order of the Commission, this being about 8.3 per cent of its gross revenues.

83. The company contends that its structural property was all needed to take care of its increasing business before the depression, and that the same therefore should not now be rejected in the appraisal as nonused or useful or marked down in value because of accrued depreciation without some form of compensation, either by making allowance therefor in the depreciation annuity or by amortization, or both, so that any loss, over and above the $2,844,682 in the depreciation reserve at the time of the valuation and the salvage value of the rejected property, may be recouped—this to cover also the $425,000 unamortized cost of change over in customers' appliances made necessary when the Company began to mix natural gas with its

product. As to the land excluded from the rate base the Company concedes tracts which are salable may be disposed of without loss, but insists that where a small, irregular piece has been cut out of the interior of a tract, as being nonuseful, and is unsalable, that it should be compensated for the loss.

84. The City answers, among other things, that the Company did not begin to set aside a depreciation reserve until 1907, and that it cannot recoup any resultant losses by charging them up to consumers in the rates exacted now. This contention is, we think, amply sustained by the authorities. As the United States Supreme Court said in Los Angeles Gas & Elec. Co. v. Railroad Comm., supra, 289 U. S. l. c. 313, 77 L. Ed. l. c. 1180, 53 Sup. Ct. l. c. 637, P. U. R. 1933C, l. c. 229: "Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future." [See, also, Galveston Elec. Co. v. Galveston, supra, 258 U. S. l. c. 395, 66 L. Ed. 678, 42 Sup. Ct. 351, P. U. R. 1922D, l. c. 165; Knoxville v. Knoxville Water Co., 212 U. S. 1, 14, 53 L. Ed. 371, 29 Sup. Ct. 148; Re Jackson County Light, Heat & Power Co. (Mo. P. S. C.), P. U. R. 1926D, 737, 752.]

85. Another point made by the City is that all the Company's gas machinery and equipment rejected by the Commission was so antequated and had so deteriorated at the time of the appraisal that it was valueless except for junk. It is a fact that the Company, itself, had retired some of this property from service, and we have already stated its condition in paragraphs 31-35 of this opinion, and have quoted the testimony of the Commission's engineer, Mr. Brockhoff, when he said "More equipment would help if you had any more good operating equipment." We also pointed out that it was an engineering question upon which we cannot pass as to whether gas set No. 3 at Station B was fit to be retained in the set-up. But conceding all this machinery had become only junk it does not necessarily follow that the Company was not entitled to the depreciation thereon; and yet, nevertheless, it still remains true that the Company cannot charge up past depreciation now, which it failed to provide for at the time.

86. Finally, it is contended by the City that when the use of oil still gas and natural gas occasioned the retirement from service of a part of the Company's gas-making equipment, it constituted an extraordinary obsolescence or supersession due to a change in the science or art of gas making and that the loss must fall on the Company, and not on consumers through rates carrying a depreciation or amortization allowance. It is pointed out that this court so held in State ex rel. City of St. Louis v. Pub. Serv. Comm., supra, 329 Mo. l. c. 941, 47 S. W. (2d) l. c. 111, P. U. R. 1932A,

l. c. 320, where it is said: "The abandonment of property which is never replaced but is superseded by another instrumentality, as gas lamps by electric lights or by another agency or company, is an extraordinary supersession. Its loss is 'one of the hazards of the game,' just as the extraordinary increase in values following the war was an unexpected gain." On this point the Commission's report says:

"We are aware that in this depreciation requirement we have not provided for unusual retirements of property caused by replacement of the service by another type of service, as in the replacement of gas by electricity for street lighting; the obsolescence of a facility as in the abandonment of the Pintsch gas plant; or by the sudden change either in the art of making gas or the discovery of a different source of supply, as in the introduction of mixed gas or natural gas into St. Louis. The allowance we are making is for the gradual wearing away of the plant. Sudden changes as enumerated above are hazards of the industry and result in a loss to the investor unless the change benefits the consumer by offering him the same service at a lower rate or a better service at the same rate, in which case the superseded property should be amortized out of the rates paid by the consumer.

"In the latter case the consumer benefits by the change and therefore should pay for the change. In the former case where the abandonment does not result in any advantage to the consumer, the loss occasioned by the abandonment must be sustained by the investor. If natural gas had been brought to St. Louis and the consumer served with straight natural gas at much lower rates than he paid for manufactured gas, it would have been proper to amortize the value of the manufacturing facilities out of the savings. The introduction of natural gas for mixing purposes has not resulted in any appreciable saving to the consumers and the consumer should, therefore, not be charged with any amount for the amortization of the units of property which we have classified as not used in public service at the present time. The Supreme Court of Missouri in its decision remanding this case to us specifically sets out that no allowance for the amortization should be made where the property suddenly goes out of service because of changes in the art. That is one of the hazards of the game."

87. First it should be remembered that the present case does not involve the retirement of the Company's Pintsch gas plant, which made a special kind of gas sold to railroad companies at private sale and not under regulation by the Commission. As to the change from gas street lights to electric lights in St. Louis the Company's brief treats it as if it was made on the mere whim and caprice of the City without any scientific basis; says there is no evidence in the record that gas is not suitable for street lighting; and asserts

that many beautiful cities still use gas for that purpose. In other words the Company asks us to overrule our former decision on this question and to hold it entitled to amortize its retired street lighting equipment. We decline to reopen this question, since we think we can take judicial notice of the fact that electricity very generally has supplanted gas for highway illumination in this country, and therefore hold the Company's loss of that business was a true case of supersession.

88. But on the Company's use of natural gas for admixture with its manufactured gas the Commission itself does not follow the theory of our decision when the case was here before. The Commission's report says sudden changes resulting from discoveries in the art of making gas or of new sources of supply are hazards of the industry and the loss must be borne by the investor *unless the change benefits the consumer by offering him the same service at a lower rate or better service at the same rate.* In so holding the Commission was right. Our ruling in State ex rel. City of St. Louis v. Pub. Serv. Comm., supra, 329 Mo. 1. c. 940-1, 47 S. W. (2d) 1. c. 111, P. U. R. 1932A, 1. c. 320, was based on Public Serv. Comm. v. United Rys. & Electric Co., 155 Md. 572, 605, 142 Atl. 870, 882, P. U. R. 1928D 141, 174, and the opinion quotes from that case, but the quotation does not give a correct understanding of what the decision held. The point there under discussion was whether extraordinary obsolescence or supersession of a utility's property should be considered in fixing the annual allowance for depreciation, and the Maryland Court of Appeals held it should not, saying:

"Ordinary obsolescence is a tangible and concrete thing, for which some allowance should be made in any estimate of depreciation in such property as that operated by the company. Experience infallibly indicates that, as a result of social or economic changes, or *the progress of science and the improvement of mechanical and electrical equipment, some part of the company's property will from time to time become out of date, and unsuited to its present needs, and should be retired.* Such obsolescence is really depreciation, and should be considered in any fair or reasonable estimate of the probable annual depreciation of the company's property. Extraordinary obsolescence, however, is quite another thing, and *by extraordinary obsolescence we mean an extensive supersession of property used for the transmission or the generation of power, or instrumentalities used for the transportation* of passengers. Such obsolescence has seldom occurred in the past, and whether it will occur in the future at all, or, if it does, when it will occur, and how extensive it will be, are all matters of unrestrained speculation and conjecture, and we know of no theory upon which any depreciation allowance could be made to cover it. If it ever does occur, it can be considered by the

commission in the light of actual facts, and such allowance and adjustments made as may be proper under the circumstances, but until it does occur it is entirely irrelevant to any consideration of the proper allowance to be made to cover the anticipated annual depreciation in the company's property.''

89. The only parts of this extract which are quoted in our former decision are those we have put in italics. But a reading of the whole paragraph will disclose that what Maryland's highest court held was that changes resulting from social, scientific and mechanical progress requiring the retirement of equipment ordinarily are to be regarded as obsolescence which must be covered by a depreciation allowance; and that it is only extraordinary, extensive supersession which does not fall within that rule. Obsolescence of that kind, says the decision, is rare, has seldom occurred in the past and is purely conjectural as to the future. It cannot be provided for in a depreciation allowance because it cannot be foreseen. But the court added that ''if it ever does occur, it can be considered by the Commission in the light of actual facts, and such allowance and adjustments made as may be proper under the circumstances.'' This would indicate a view that even extraordinary supersession may be recouped. We are unwilling to hold that consumers can be required to underwrite a utility business which is expiring either because of the avulsive effect of new methods or inventions, or changes in public demands, or extraordinary shifts of population, and the like; but it is well settled that a utility is entitled to earn a return reasonably sufficient to keep it abreast of advancements affecting the business it conducts. As the Nebraska State Railway Commission said in Re Fairfield Telephone Company, P. U. R. 1918B, 154, 160, ''the constant progress under way in the art of telephony must be considered in providing for depreciation, otherwise the utility will be unable to furnish the patrons with modern service.''

90. There are many examples of this. Thus in Pacific Gas & Elec. Co. v. San Francisco, 265 U. S. 403, 415, 68 L. Ed. 1075, 44 Sup. Ct. 537, where a gas company availed itself of recently patented methods of manufacturing gas which reduced the cost of production and rendered part of its equipment obsolete, it was held the Company should not be declared to have ''worsened its situation for rate-making purposes when it reduced the cost of manufacturing gas;'' and that the fair value of the patents should be added to the rate base or prompt recoupment should be allowed for the obsolescence caused by their introduction. And in K. C. So. Ry. v. United States, 231 U. S. 423, 452, 58 L. Ed. 296, 34 Sup. Ct. 125, where a railroad had abandoned parts of its roadbed, built in an earlier day when curves were sharper and grades heavier, and had relocated it to meet modern traffic requirements, it was held the Interstate Commerce Commission

could *require* the Company to charge the replacement cost of the abandoned sections to operating expenses and amortize it over a period of years if the charge would unduly burden the revenues of a single year.

91. Amortization allowances have been made in other states to compensate for depreciation or obsolescence occasioned by a change from manufactured gas to natural gas; Santa Barbara v. Southern Counties Gas Co., P. U. R. 1928E, 767, 770; Re Southern Counties Gas Co., P. U. R. 1921B, 705, 710. The Missouri Public Service Commission in Re St. Joseph Ry., Light, Heat & Power Co., 5 P. U. R. (N. S.) 253, allowed a street railway company to amortize in part the value of certain street cars which were superseded by trolley coaches, and in its report cited a number of precedents for that action. Many others are listed in the Company's brief here.

92. The Commission's report concedes the Company would be entitled to amortize the value of gas manufacturing equipment retired because of the use of natural gas if it were furnishing straight natural gas to consumers at much lower rates, but holds it cannot be done in this case because the natural gas is used only for mixing purposes and has not resulted in any appreciable saving to consumers. The writer does not agree to that. As we have stated, when the change over occurred the Company reduced its rates in August, 1932, $600,000 per year, which was about 8.3 per cent of its gross revenue. This was $100,000 per year more than the entire $500,000 annual depreciation allowance which the Commission has fixed in its report. It is almost exactly 20 per cent of the $3,035,000 which the Commission is allowing the Company for its fair return of 6½ per cent and its annual depreciation allowance, as we shall see in paragraph 100 of this opinion, where it will also appear that the Commission engaged in intricate calculations to save domestic consumers about $349,000, this being only a little more than half as much as the $600,000 saved by the 1932 rate reduction here under discussion. If the Company were changing over to natural gas exclusively it would seem the amount of equipment retired would be considerably larger and the amortization expense heavier.

93. But even though it be conceded that the value of the equipment retired because of the use of natural gas for mixing purposes can, as a matter of law, be amortized, the Company is still confronted with the fact that it failed for many years before 1907 to set aside a depreciation reserve. Part of its present equipment was installed before that time. Some of it has been voluntarily retired by the Company. The junk value of the property retired by the Company or ordered retired by the Commission is not clear. The Company had $2,844,682 in its depreciation reserve at the time of the appraisal. We can see no basis, on the record before us, and on the

valuations fixed by the Commission and affirmed in this opinion, for saying the Company can now charge to consumers by amortization the value of the property found to be nonused or useful.

94. The unamortized $425,000 part of the $500,000 cost of changing customers' appliances when natural gas was introduced for mixing purposes stands on a different footing. Likewise, under Section 5250, Revised Statutes 1929 (Mo. Stat. Ann., p. 6674), when audits or appraisals of a public utility are made by the Commission the former must pay the expense thereof. The Company states in its brief that at the time of the hearing it was obligated for $224,387 unamortized expenses of this character and contends it should have credit both for it and the change over cost just mentioned in its working capital, which enters into the rate base. We do not understand that such outlays as this should be capitalized and that consumers should pay a return on them forever. [Kansas City So. Ry. v. United States, supra, 231 U. S. l. c. 456, 58 L. Ed. 296, 34 Sup. Ct. 125.] But they may be charged to operating expenses and amortized where necessary, if that has not already been done. [Consolidated Gas Co. v. Prendergast, 6 Fed. (2d) 243, 280 (2); Re Pacific Elec. Ry. Co., P. U. R. 1922C, 134, 168.]

95. Another item of expense about which there is controversy involves engineering expenses incurred by the Company in connection with the hearing below. It employed two firms of engineers, paying one $44,776.21 and the other $56,902.21. Experts from both testified at the hearing. There is no question as to the value of their services, but the Commission in its report says two firms were unnecessary and gives expression to a surmise that the Company desired to avail itself of the cumulative effect of their estimates and testimony. Accordingly the amount necessary to amortize $45,000 of this outlay was excluded from the Company's estimate of operating expenses. The Company contends it merely exercised its business judgment in the matter and that the Commission had no right to interfere. We think the Commission was authorized to determine whether the expense was reasonable and can see no ground for reversing its finding.

96. The Commission fixed $6\frac{1}{2}$ per cent as a reasonable return on the $39,000,000 fair value of the property. The Company contended the rate should be 8 per cent and the City argued for 6 per cent or less. In view of prevailing interest rates at the time of the hearing and the predicted increase in revenues from the same property with improved economic conditions, we think the $6\frac{1}{2}$ per cent allowance was sufficient.

RATES.

■ 97. *Comparison of Rates.* The Commission ordered the Company to file a new schedule of gas rates effecting a reduction of 6 per cent to ordinary domestic and commercial consumers. It was further authorized to revise its heating and industrial rates so as to absorb the aforesaid reduction and hold the total return to $6\frac{1}{2}$ per cent. As bearing on the question of rates the City makes a bitter assault upon the Company, complaining that it is overcapitalized, overbonded, that its rates have been higher than in other comparable cities and that under the dominion of outside financial interests manipulating holding and allied corporations its operating costs have been excessively heavy. The Company argues that the City's evidence on these points was incompetent and immaterial without a detailed inquiry into the conditions under which those other utilities operate and proof that they are similar to the conditions encountered in St. Louis. This court considered such evidence in State ex rel. Watts Engineering Co. v. Pub. Serv. Comm., 269 Mo. 525, 538, 191 S. W. 412, 416 But in State ex rel. City of St. Louis v. Pub. Serv. Comm., supra, 329 Mo. l. c. 951, 47 S. W. (2d) l. c. 116, P. U. R. 1932A, l. c. 329, when this case was here before it was held to have been properly rejected. The valuation and rate of return in the instant proceeding have been fixed by the Commission independently on the basis of fair value and general operating conditions. There is nothing in its report to indicate it has sanctioned wasteful outlays for operation. Some items of expense were rejected. We cannot overturn the report and order on this ground.

■ 98. *Allocation of Rates.* But operating expenses do enter into the question of rates in another way, and probably the most hotly contested issue in the case turns thereon. The $6\frac{1}{2}$ per cent fair return which the Commission's report authorizes the Company to receive means, of course, a *net* return upon the $39,000,000 fair value of the property. To determine whether the Company in the test year, 1935, would earn a net revenue of $6\frac{1}{2}$ per cent on the investment it was necessary to forecast what the receipts and expenditures for that year would be. In so doing the Commission endeavored also collaterally to protect domestic consumers as against househeating consumers, whose relative demands upon the Company's facilities are more fluctuating since gas for househeating is required only during the fall, winter and early spring months and the demand is so largely governed by the weather.

99. What the Commission did was this. First it took the actual gas sales of 40,771,142 therms in the year 1933 (an average of 111,702 therms per day) and the maximum day's send-out for that year, 191,258 therms, and from them ascertained the "load factor" or ratio of the average day's sales to the maximum day's send-out. This

was found to be 58.4 per cent.* Then it accepted the Company's estimate that the maximum day's send-out in 1935 would be 270,000 therms, in round numbers, and assumed that the load factor for that year would be the same as in 1933, which furnished a mathematical basis for computing that the total sales in 1935 would be 57,528,081 therms. From this theoretical total sales of 57,528,081 therms the report subtracted the 47,053,856 therms total sales for the year ending June 30, 1935, as estimated by Mr. White, vice president of the Company (not the 48,581,000 therms estimated for the whole *calendar* year 1935 appearing in the table set out in paragraph 26 of this opinion), and obtained a remainder of 10,474,224 therms. Of this remainder the report says "the difference of 10,474,224 therms between the amount which the Company could theoretically sell and the amount which White estimates the Company will sell is, no doubt, due to the fact that heating customers buy gas only during approximately five months of the year."

100. The report then proceeds to compute the net revenue which would be derived from the sale of this imaginary additional 10,474,224 therms of gas and finds it to be $403,258. Adding this amount to the Commission's estimate of the Company's other net revenue for the year 1935 gave a total of $3,383,677. A 6½ per cent annual return on the $39,000,000 fair value of the property would be $2,535,000, and this plus the $500,000 annual depreciation allowance would make $3,035,000 which the Company was entitled to receive annually. Substracting that sum from the aforesaid estimated net annual revenue of $3,383,677 left an overplus of $348,677. This was just about 6 per cent of the revenue from domestic and commercial consumers under the general service rate, so the Commission ordered the Company to make a 6 per cent reduction in that rate, and authorized it to "revise" its househeating and industrial rates in an effort to obtain from actual sales the $403,258 *theoretical* househeating sales added by the Commission in its estimate.

101. The Commission conceded that the Company would not actually earn as much from househeating as its report had thus estimated. But it proceeded on this theory: that the heavy and erratic requirements of househeating customers make the load factor low,

---

*It would have been more accurate if the Commission had computed the ratio of the average day's *send-out* (instead of sales) to the maximum day's send-out, since the send-out covers all gas sent out including that not sold, such as leakage and gas used by the Company. This amounted to 2,528,791 therms in 1933, an average of 6,928 therms per day. In comparing the average day's *sales* with the maximum day's send-out the Commission necessarily excludes this unsold gas from the former and includes it in the latter. The load factor correctly computed would be 62 per cent instead of 58.4 per cent as the Commission has figured it. But to avoid complications and for the purposes of comparison we have followed in this discussion the method used by the Commission.

necessitating the retention in the property account of a considerable part of the Company's gas manufacturing machinery to meet the peak demand, thereby swelling the rate base and consequently the rates collected in paying a fair return thereon; and that these consumers should therefore bear the resulting burden. (Ideal conditions would make the load factor 100 per cent, the average daily demand and the maximum daily demand being equal.) The report speaks of the Company's househeating rate as a promotional rate offered to develop that business at the expense of domestic consumers. There is some justice in that contention, though it is also true, as the City maintains on another point in its brief, that the larger the gas output, especially per consumer, the lower the cost of manufacture, and ultimately the lower the rates will become. And, as the City further points out, if the Company had shut-off contracts with industries, so that their gas supply could be stopped on days when the househeating and domestic demands are burdensome, the load factor would be higher. From the standpoint of the City, at least, it would seem the smoke problem in St. Louis also might be entitled to some consideration.

102. But taking the case as it stands, the Commission's general theory is founded on authority. In San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 446, 47 L. Ed. 892, 23 Sup. Ct. 571, a water plant had been overbuilt to irrigate an area of 6000 acres which it did not, in fact, supply. The rates were fixed on the theoretical assumption that this business did exist, to fit the valuation of the plant, but of course no revenue was derived from the assumed but actually nonexisting business. The United States Supreme Court held the rates were not confiscatory, saying, "if a plant is built, as probably this was, for a larger area than it finds itself able to supply, or, apart from that, if it does not, as yet, have the customers contemplated, neither justice nor the Constitution requires that, say, two-thirds of the contemplated number should pay a full return." The effect of this was to allow the utility a fair return only on a rate base sufficient to supply the existing demand. [See, also, Pub. Serv. Comm. v. Great Northern Utilities Co., 289 U. S. 130, 135, 77 L. Ed. 1080, 53 Sup. Ct. 546.] On the other hand it is held that when a utility "starts with new works, or a large addition to the original supply, (it) is entitled to an income therefrom somewhat greater than what is due to the cost of work(s) sufficient merely to meet the present demands." [Long Branch Comm. v. Tintern Manor Water Co., 70 N. J. Eq. 71, 85, 62 Atl. 474, P. U. R. 1918A, 178.] That some favorable consideration should be given in rate making to the fact that a plant is developing a new business or territory is but the converse of the proposition that when it is fully established and more able to do business economically its rates should be lower. And for this purpose the plant may be viewed as a whole, though only a

part of its business is being developed, if the benefit ultimately will redound to the whole.

103. However, conceding there is merit in the Commission's legal theory there probably is some ground for asserting its calculations do not *mathematically* justify the conclusion drawn. As heretofore stated, the load factor for any year is the ratio of the average day's sales to the maximum day's demand. In 1933 it was 58.4 per cent. In 1935 (using round numbers) on the basis of the Company's estimate that its annual sales would be 47,000,000 therms and its peak day send-out 270,000 therms, it would be about 49 per cent. The Commission's report applied the 1933 load factor of 58.4 per cent to the year 1935, and thereby found, in effect, that if the demands of the various kinds of gas service (seasonal and regular) stood in the same ratio to each other in the year 1935 as they did in 1933, and the maximum day's demand in 1935 was 270,000 therms, the total annual sales that year theoretically would be 57,000,000 therms. But (owing to the poorer load factor of 49 per cent) the Company estimated it would only sell 47,000,000 therms of gas in 1935. The Commission charged the difference of 10,000,000 therms to househeating and held that service to be solely responsible for the decline in the load factor, because househeating is entirely seasonal, with a poor load factor, and the Company had estimated that in 1935 it would have over three times as many househeating customers as it had in 1933. This conclusion, it may be conceded, is purely deductive, and without any figures to support it—mathematically.

104. But notwithstanding all this we cannot see how the Company was hurt by the Commission's calculations for it appears in the record that the Company estimated the maximum demand or peak day use per househeating installation in St. Louis is 30.1 therms. Mr. Lucas, its expert, so testified directly. He further testified that he estimated by the end of 1935 there would be 4500 househeating customers. This multiplied by 30.1 gives 135,450 therms as the househeating demand for gas on the peak day for that year. The Company estimated the total send-out on that peak day would be 270,000 therms. So it follows that the househeating demand would be slightly over one-half of the total demand. And if it be true that househeating is responsible for more than half of the maximum day's demand for gas, then there certainly can be no injustice to the Company in charging it up with $403,258 theoretical gas sales for househeating, which is only about 11 per cent of the $3,383,677 total net revenue from all gas sales for the year. Further, with the facts shown that househeating is responsible for 135,450 therms of the estimated peak day demand for 1935, the 1933 load factor of 58.4 per cent can be applied to *that figure* because therein the househeating demand is segregated. Doing so, the theoretical consumption of

gas for househeating in the year 1935 would not be merely 10,000,000 therms, as the Commission has estimated; it would be more than twice that, exceeding 28,000,000 therms, which justifies the inclusion in its balance sheet of a much larger theoretical revenue from househeating than the Commission has charged up to it in its report.

105. The Company cannot complain of the use of the 1933 load factor of 58.4 per cent in computing its theoretical sales in 1935 for that load factor is much higher and more favorable to the Company than the one obtained from its own estimates, which is only 49 per cent. For the reasons stated the Company's contention on this point must be disallowed. It should be stated, however, that if, through the medium of shut-off industrial contracts, the Company is able to utilize a substantial part of its plant capacity in off-peak periods, so as to bring up the load factor in combination with househeating, the situation would be different; and if there had been such a showing doubtless the Commission's order would not have been what it is. It is based on the Company's own showing of an anticipated poor load factor for which househeating is predominately responsible.

CONCLUSION

This opinion calls for a re-examination by the Commission of the following questions:

Allowance of general overhead for engineering and superintendence. See paragraphs 39-42.

Allowance for accrued depreciation. See paragraphs 54, 55, 56, 68.

Allowance of general overhead for taxes during construction. See paragraphs 43-48; or for working capital. See paragraph 66.

Allowance for annual depreciation. See paragraphs 77-78.

Amortization of cost of change over expense, and cost of appraisals. See paragraph 94.

It will be observed the table at the beginning of this opinion shows the fair value at reproduction cost of all the Company's used and useful property, depreciated, to which is added $4,466,067 "for upward price trends and going value." The table in paragraph 68, and the discussion at the end of paragraph 76 treated said $4,466,067 as representing these same elements of value. As a matter of fact the Commission also took into consideration the original or investment cost of the Company's tangible property in arriving at the valuation of $39,000,000, and the inclusion of said item of $4,466,067 is not to be considered as excluding that fact.

Subject to the foregoing the judgment is affirmed and the cause remanded with directions to the circuit court to remand to the Commission that it may rehear and determine the facts on the four points above mentioned in accordance with the views of this opinion.

All concur, except *Douglas, J.,* not voting because not a member of the court when this cause was submitted.