# CHRISTINA A. BOELTER v. MRS. A. T. CRIST, as Executrix of the Estate of A. T. Crist, Deceased.

(157 N. W. 115.)

**Evidence — finding of jury — funds — property — sufficiency.**

Evidence examined and *held:*

1. Sufficient to justify a finding by the jury that the funds claimed by plaintiff never belonged to her, but at all times had been the property of her husband.

**Statute of frauds — promise by wife — debts of husband — to pay — effect.**

2. Under the holding in ¶ 1, it becomes immaterial whether the statute of frauds bars a promise by the wife to pay the debts of her husband.

**Transactions — bank — personal — evidence — error.**

3. It was not error to allow defendant to show that the transactions in question were those of the bank, and not personal transactions.

**Verdict — motion for directed — upon certain items — evidence — complaint — funds — husband.**

4. The court properly denied motion to direct a verdict upon two items mentioned in the complaint. The evidence of the plaintiff, if true, would merely show that those particular funds belonged to her husband. This would not justify a verdict in her favor.

Opinion filed March 6, 1916.

Appeal from the District Court of La Moure County, *Nuessle,* J. Affirmed.

*Lawrence & Murphy,* for appellant.

The wife's money cannot be used in payment of her husband's debts, without her consent in writing. Williams v. Whiting, 92 N. C. 683; Rev. Codes 1905, §§ 5712–5723, 5775, Comp. Laws 1913, §§ 6281–6292, 6343.

The oral promise of the husband, acting as his wife's agent, to pay his own debts out of her property, is not binding upon her. Lowry v. Beckner, 5 B. Mon. 41.

The statute of frauds bars any claim that appellant assumed and agreed to pay the debts of her husband. 31 Cyc. 1303, 1351, and cases cited.

*Jones & Hutchinson,* for respondent.

Burke, J. Plaintiff's husband in the early days of this state filed upon and obtained title to a government homestead in La Moure county. This land remained in his name until it was sold, or possibly traded in part for another tract of land in the same county. This second tract was also taken in the husband's name, and it in turn was sold or traded to one A. T. Crist, the cashier of a bank at Dickey, North Dakota. This transaction occurred in January, 1909, and in return for the second tract of land a third tract was taken, but this time in the name of the wife, this plaintiff, Mrs. Boelter. The evidence of title was a contract for deed upon which there remained a balance due of something over $2,000. Plaintiff's husband cropped this land in 1909, and in October of that year a sale was made of said tract for $4,000. At that time there remained due to Crist upon the purchase price, $2,178.75. At or about the same time, the husband held a public auction sale of his personal property at which said Crist, the cashier of the bank, acted as clerk. As a result of the sale of the personal property, $951.10 was collected by Crist. The bank, during all this time, was a creditor of the husband and also held claims against him belonging to other parties for collection. After the sale of the third tract of land and the personal property, Crist, or his bank, had possession of about $2,772.35 of funds belonging either to Boelter or his wife, and with these funds the bank reimbursed itself and paid the entire amount remaining upon claims it held for collection against Boelter. The bank made a full statement of its handling of this money, and the same was presented personally to the plaintiff, who later delivered it to her husband, November 26, 1909. Thereafter plaintiff and her husband removed to another part of the state. In the following spring the husband spoke to Crist about the account, and asked for the balance, if any, of the funds remaining in his hands. Crist told him that he had nothing coming. No further intimation was given to any person that the account was inaccurate until August, 1913, after Crist had died. At that time the wife, this plaintiff, insisted that the purchase price of the third tract of land belonged to her, and demanded that the estate of Crist reimburse her for the same. The trial was had to a jury, who found for the defendant upon all the issues. Plaintiff appeals, assigning errors of law occurring at the trial.

(1) Appellant insists that there was no evidence that she had author-

ized Mr. Crist to use any of her funds in payment of her husband's debts. Respondent meets this issue with the plain statement that from the evidence the jury was justified in finding, and undoubtedly did find, that the funds never had in truth and fact belonged to the wife, and that therefore she could not sue for its recovery. They further insist that the evidence would justify the jury in finding that Crist personally did not disburse the money, but that the same was disbursed by the Dickey State Bank, of which he was cashier. This requires an examination of the testimony, which we have done. We will content ourselves with printing small extracts therefrom.

Plaintiff testified that her husband was the owner of a government homestead and was about to sell the same; that she never had any title in the same, but Boelter wanted to sell the land, and I told him I would not sell until I got half.

Q. You mean the homestead?

A. Yes, sir.

Q. Go ahead.

A. Then he sold the homestead.

Q. You signed the deed with him?

A. Yes, sir.

Q. What did you do with the proceeds?

A. We bought the land at Ypsilanti.

. . . . . . .

Q. Do you know where that deal was made by which you acquired the Ypsilanti land, or your husband got the title to it?

A. I don't remember.

. . . . . . .

Q. Mrs. Boelter, you don't know very much about business affairs, do you?

A. No, sir, I did not.

Q. Mr. Boelter has handled your matters for you?

A. Yes.

Q. Acting as your agent in this matter, connected with this land?

A. Yes, sir.

Q. Did you ever talk with Mr. Crist, the defendant, when you got this land?

A. No.

. . . . . . . .

Q. The business then, Mrs. Boelter, in regard to this transaction, was all transacted through your husband?

A. Yes, sir.

Q. You know nothing, practically speaking, regarding this matter?

A. Not very much, no.

. . . . . . . .

Q. Do you know how much money you paid?

A. Yes, sir.

Q. How much?

A. Somewhere about $2,100—$1,800 I think was the first payment, and we made a half crop payment.

. . . . . . .

Q. When did you sell the homestead?

A. I don't remember.

. . . . . . .

Q. You farmed the land?

A. Yes, Mr. Boelter did.

Q. What arrangements did you make with Mr. Boelter?

A. He was to get half of the crop, and the other half was to go to Mr. Crist for the payment.

. . . . . . . .

Q. The crop was harvested and disposed of by your husband?

A. Yes, sir.

. . . . . . . .

Q. How much did you buy it for from Mr. Crist?

A. Twenty-one dollars or twenty-two dollars, I don't remember which.

. . . . . . .

A. I don't remember. Boelter handled those papers, and I didn't know much about it.

. . . . . . . .

Q. You stated that the money you paid for this land came from your homestead?

. . . . . . . .

Q. Was that a government homestead?

A. Yes, sir.

Q. You filed on the land?

A. Boelter did.

Q. And he proved up on it?

A. Yes, sir.

. . . . . . .

Q. Who bought the land at Ypsilanti?

A. Boelter bought it for me.

Q. It was in his name, wasn't it?

A. It was at that time.

. . . . . . .

Q. This was a government homestead, you had, was it?

A. Yes, sir.

Q. It was proved up by Mr. Boelter?

A. Yes.

Q. Did he ever deed any part of it to you?

A. No.

Q. Do you mean to say that you ever held any title to this Ypsilanti land in your own name?

A. I didn't hold any title then.

. . . . . . .

Q. State if you remember whether Mr. Boelter deeded to you or to Mr. Crist, or whether Mr. Boelter deeded that land to Mr. Crist for you; how was that, do you remember anything about that?

A. I don't understand enough about it.

Q. You don't remember whether you made a deed to Crist for this land at Ypsilanti, or whether Mr. Boelter did?

A. I don't remember.

The husband was also a witness and testified:

A. It really belonged to my wife, because when she sold it, she wouldn't sell it unless she got half the money.

. . . . . . . .

After testifying to his possession of the third tract, he says:

A. There was a little granary that I had built on the place.

He also admitted owing almost all of the debts for which he had been charged by the bank.

He also testified:

Q. You acted as agent for Mrs. Boelter in this transaction?

A. Yes, sir.

Q. In fact, you conducted the whole transaction?

A. I did.

Q. She never did any business, did she, in connection with this place?

A. Not alone; I was there when she did.

Q. So far as the sale was concerned, you conducted it entirely your-self, did you not?

.   .   .   .   .   .   .   .

Q. Did she sell it?

A. No, she did not.

Q. Who requested the sale to be made?

A. She just simply, when she went away, told me if I could sell it, to sell it.

Q. She told you to sell it?

A. Yes, sir.

Q. She put it into your hands for sale?

A. Yes, she did.

Q. You had the whole conduct of the matter in your hands?

A. I did.

Other witnesses were sworn, including Jordon, the man who pur-chased the land. He was a storekeeper who had a rather large account against Boelter.

His testimony, in part, is as follows:

A. He was owing me quite a bill and I talked to him about it, and he said that if he could sell that quarter of land he could pay me, but he didn't see how he could otherwise; and I asked him what he wanted for it and he said $25, and we talked a while, and during our talk Mr. Boelter told me that he owed Mr. Roberts, the man he secured the engine to, about $800;  .  .  .  I told him if he could do that, I would take the land.

Q. Did he say anything in this conversation relative to Mrs. Boelter owning the land?

A. No, I don't think so.

Q. Did you know anything about Mrs. Boelter owning the land?

A. No.

. . . . . . .

Q. What did you tell him?

A. I told him I would take the land, providing my claim was paid, and he said that was all right.

. . . . . . .

Q. As to this obligation that Mr. Boelter owed to you, that wasn't any debt of Mrs. Boelter's, was it?

A. It was a store bill charged to G. E. Boelter, but she came there and got goods the same as him.

Mr. Roberts, another creditor, testified that Boelter owed him $800; that Mr. Boelter had signed the notes.

And he further testifies:

Q. Were those notes secured in any other manner?

A. Yes, sir, by an assignment of land contract. (Describing the land in suit.)

. . . . . . .

Q. Was this assignment of the contract in writing, Mr. Roberts?

A. It was.

Q. Was it attached to the contract, or not?

A. It was.

Q. Did you see Mrs. Boelter sign it?

A. I did.

Q. Personally, did you?

A. Yes, sir.

Q. Where was this assignment of the contract kept after you got it, Mr. Roberts?

A. I deposited it in the Dickey State Bank.

. . . . . . .

I dealt with the bank.

Mr. Mack, another creditor, was a witness, and testified that his transactions were entirely with the bank.

We will not unnecessarily encumber the record with further extracts of the testimony. It is sufficient to say that the jury might properly have found the taking of the contract of the third tract in the wife's name a sham and fraud. The burden was upon her to show that Crist had her money. In this the jury found that she failed. It really ends the lawsuit.

(2) The second proposition advanced by appellant is that the statute of frauds bars any claim that appellant assumed, in agreeing to pay the debts of her husband. This assignment is based upon the assumption that Crist had appellant's money. As we have seen in the foregoing, the jury may, and probably did, find otherwise. Such being the case, it was likewise proper for the trial court to submit the case to the jury in place of directing a verdict.

(3) Error is assigned upon the admission of evidence tending to show that the bank had received the money and disbursed it, and that Crist, whose executrix is the defendant in this action, had nothing to do with the transfer. It is claimed that this defense was not pleaded. The answer was a general denial coupled with an allegation that if there was any transaction between A. T. Crist, deceased, and this plaintiff, a full settlement had been had according to the instructions of the plaintiff. We do not believe this amounts to an admission of the receipt of any of the money belonging to plaintiff. Under the general denial, then, defendant could show the fact that no money had come into his hands, but that the funds were received by the bank. For this reason we believe it was proper to admit in evidence exhibit 1, which was the statement handed to this plaintiff and by her to her husband showing the disbursements made in the fall of 1909.

(4) It was next insisted that it was error to refuse to instruct the jury to return a verdict in plaintiff's favor on two items known as the Manning and Lee notes in exhibit B. Appellant insists that there is no evidence that either the husband or the wife owned either Crist or the bank or anybody else those two items, amounting to $249.25. We cannot see why the wife should be entitled to the verdict upon those items, if they, as she claims, belonged to her husband. In fact, appel-

lant's whole case falls with the proposition which we have already stated, that there was sufficient evidence to support a finding by the jury that the funds all belonged to the husband. Judgment is affirmed.