PUBLIC SERVICE COMMISSION OF
STATE of North Dakota, Appellant,

v.

MONTANA–DAKOTA UTILITIES COM-
PANY, Respondent (two cases).

Nos. 7845, 7846.

Supreme Court of North Dakota.

Dec. 10, 1959.

Gerald G. Glaser, Commerce Counsel, Bismarck, for appellant.

Cox, Pearce & Engebretson, Bismarck, Earl H. A. Isensee, Minneapolis, Minn., for respondent.

TEIGEN, Judge.

This is an appeal by the Public Service Commission of the State of North Dakota from two judgments entered by the District Court of Ward County, Second Judicial District.

The judgments are identical as to relief granted and involve the same parties and the same subject matter before the Commission and they have, accordingly, been consolidated for this opinion.

The Montana-Dakota Utilities Company, hereinafter called the Utility, filed two applications with the Public Service Commission of the State of North Dakota, hereinafter called the Commission. In one it asked that it be determined that no certificate of public convenience and necessity was necessary to construct and operate a natural gas transmission line from Tioga to Minot, to construct and operate natural gas distribution systems to be served by such transmission line in the communities of White Earth, Ross, Stanley, Palermo, Berthold, Des Lacs, and Burlington, or in the alternative that if certificates of public convenience and necessity are required to construct and operate the proposed facilities that the same be issued and that rate schedules proposed by the Utility be approved as rates for rendering natural gas service to the communities of Tioga, White Earth, Ross, Palermo, Berthold, Des Lacs, Burlington and Minot.

The second application prayed that the Commission determine that public convenience and necessity require the construction and operation of natural gas distribution systems in the municipalities of Epping, Wheelock, and Ray. That the Utility is not required to secure a certificate of public convenience and necessity to construct and operate a natural gas transmission pipe line from Tioga to the City of Williston and the construction and operation of the distribution system in the municipality of Springbrook or in the alternative that if the Commission determines that a certificate of public convenience and necessity is necessary that the same be issued and that certain rate schedules proposed by the Utility be approved for the municipalities of Ray, Wheelock, Epping, Springbrook, Williston and East Fairview.

The applications proposed rate changes in the municipalities of Minot, Tioga, Williston and East Fairview, which municipalities the Utility already was serving either through its existing natural gas transmission and distribution systems or propane air-gas distribution systems. The Commission held hearings on the applications and five final orders were issued by the Commission. The Utility immediately appealed therefrom to the District Court. Upon petition for remand by the Commission the District Court remanded the two cases for further hearings before the Commission. Further hearings were held and new final orders were issued by the Commission voiding and setting aside the original five orders and issued new orders in each of the two cases. The Utility appealed from these orders to the District Court. The District Court in each case entered judgment upon appeal and decreed:

1. That no certificate of public convenience and necessity was or is required for the construction and operation of a natural gas transmission pipe line by the Utility from Tioga to Williston or the distribution system in any of the communities to be served by said pipe line in one judgment and that no certificate of public convenience and necessity was necessary for the construction and operation of natural gas pipe line from Tioga to Minot or for the construction and operation of distribution systems of any of the communities to be served by the said pipe line in the other, and based its decisions upon the exceptions provided in sub-section 3 of Section 49-0301, NDRC of 1943 as amended.

2. That the rate schedules and charges filed by the Utility in each of the proceedings are the only legal schedules of rates and charges for gas service in the communities.

3. That the proceedings in the cases be remanded to the Public Service Commission for disposition in accordance with the decision of the court.

These judgments were contrary to the final orders of the Commission which had determined,

1. That certificates of public convenience and necessity were necessary under the law,

2. That public convenience and necessity existed,

3. That the rate schedules filed by the Utility for the communities of Williston, and East Fairview be approved but that the rate schedules for the remaining communities were excessive and ordered a reduction in those rates, and

4. That the Secretary of the Commission be authorized and directed to issue certificates of public convenience and necessity conditioned, however, upon receipt of written consent from the Utility agreeing to comply with the provisions of the rate orders issued by the Commission.

The Commission in its appeal to this court sets up the following issues:

1. Was the Utility required to obtain certificates of public convenience and necessity before (a) constructing the pipe line and distribution facilities from Tioga to Minot, and (b) constructing distribution facilities in the community served by the line constructed from Williston to Tioga?

2. Is there substantial evidence to support the Commission's findings that the rates proposed by the Utility were unreasonable, unnecessary and discriminatory?

3. Did the District Court, and does the Supreme Court, have the jurisdictional power to interfere in this proceeding, with the Commission's orders prescribing uniform rates?

The application, insofar as it related to the pipe line proposed to be built from Tioga to Williston, was dropped from the proceedings because it was agreed it would be interstate in character and therefore under the jurisdiction of the Federal Power Commission.

The law provides that on an appeal from an order of the Public Service Commission the court shall try and hear the appeal "after such hearing, the court shall affirm the decision of the agency unless it shall find that such decision or determination is not in accordance with law, * * *" Sec. 28–3219, NDRC 1943. The Utility in its applications prayed in the alternative, first, that it be determined that a certificate of public convenience and necessity was not necessary, and second, that if it was found to be necessary that the same be issued. The Commission found in its opinion the issuance of a certificate was necessary, that public convenience and necessity existed and that certificates be issued. However, the objectionable part of the Commission's orders to the Utility was the fact that the issuance was conditioned upon the requirement that the Utility file in writing its agreement to comply with the provisions of the order establishing a lower rate schedule.

The Public Service Commission is a constitutional body having only such powers and duties as are prescribed by law. Sections 82 and 83 of the North Dakota Constitution. A careful examination of the statutes fails to disclose any language indicative of a legislative intention to confer upon the Commission the power to order the issuance of a certificate of public convenience and necessity conditioned upon prior receipt of a written consent to comply with a rate schedule ordered by the Commission. Chapter 49–03, NDRC 1943 and amendments thereto establishes the Commission's powers relative to the issuance of certificates of public convenience and necessity. Section 49–0302 sets forth the prerequisites to issuance and a careful examination of that section does not disclose such power. We determine the power does not exist by implication for the reason that the statutes give the Commission ample power to enforce its lawful orders in the courts. See Section 49–0202, 1957 Supplement to NDRC of 1943. The condition, therefore, made a prerequisite to the issuance of a certificate being outside of the scope and powers of the Commission is, in our opinion, void;

it falls beyond the purview of the statutes, and is not in accordance with law. Petition of Village Board of Wheatland, 77 N.D. 194, 42 N.W.2d 321; Chrysler Light & Power Co. v. City of Belfield, 58 N.D. 33, 224 N.W. 871, 63 A.L.R. 1337; Williams Electric Cooperative, Inc. v. Montana-Dakota Utilities Co., N.D., 79 N.W.2d 508; City of Grafton v. Otter Tail Power Co., N.D., 86 N.W.2d 197, 42 Am.Jur. Public Administrative Law, Section 26.

The orders of the Commission authorizing and directing the issuance of the certificates of public convenience and necessity, stripped of their void conditions, leaves the issue of whether or not the Utility is required to obtain a certificate of public convenience and necessity in these cases moot and academic. An opinion thereon would be merely advisory and this court will not give an advisory opinion. The point no longer fairly arises from the record. Constitution, Section 101; In re Novak's Estate, 73 N.D. 41, 11 N.W.2d 64; Moug v. North Dakota Workmen's Compensation Bureau, 70 N.D. 656, 297 N.W. 129; Boelter v. Crist, 33 N.D. 331, 157 N.W. 115; Northwestern Mutual Savings & Loan Ass'n v. White, 31 N.D. 348, 153 N.W. 972; Heald v. Strong, 24 N.D. 120, 138 N.W. 1114, and, In re Kaeppler, 7 N.D. 307, 75 N.W. 253.

The judgment of the District Court must therefore be modified in this respect to comply with this opinion.

The second issue raised by the appellant Commission is stated as follows:

"Is there substantial evidence to support the Commission's findings that the rates proposed by the Utility are or were unreasonable, unnecessary and discriminatory?"

In general, the governing principle for determining rates to be charged by a utility is the right of the public on one hand to be served at a reasonable charge, and the right of the Utility on the other

to a fair return on the value of its property used in the service. After the value or rate base of the property used and useful in the public utility business is ascertained, next to be ascertained is the amount of the operating expenses as compared with the gross income, after which a conclusion can be drawn as to the rates necessary for a fair return on the property. 43 Am.Jur. Public Utilities, Section 156, page 674.

In its appeal from the order of the Commission the Utility challenged the right of the Commission to examine into the area of profits to Amerada Petroleum Corporation and Signal Oil and Gas Company as the suppliers of residue gas to the Utility pursuant to contracts entered into between the Utility and the said suppliers when the said suppliers are not owned or controlled directly or indirectly by the Utility or any affiliate, subsidiary, parent company, associate or a corporation whose controlling stockholders are also controlling stockholders in such Utility as provided in Section 49-0202(6), 1957 Supp. to NDRC of 1943, and the contracts between the Utility and the said suppliers were negotiated at arm's length. The Commission on the other hand contends that it had a right to examine into the profits of the suppliers by virtue of Section 49-0604, NDRC 1943 making it the duty of the Commission in determining proper rates to disallow advanced or fictitious prices or prices in excess of fair market value paid for any commodity, by the Utility. The Commission makes no claim that the price agreed to be paid by the Utility for residue gas from its contract suppliers is a "fictitious or advanced" price as set forth in the section above cited but they found and determined that the price agreed to be paid by the Utility to its suppliers for "firm" gas pursuant to the contracts entered into between them provided prices in excess of the fair market value in the amount of seven cents per thousand cubic feet and that this was one of the major factors determined by the Commission from which they concluded

the rates as proposed by the Utility were unreasonable.

The only processor of natural gas to the residue gas form in North Dakota is the Signal Oil & Gas Company which in turn obtains a major portion of the natural gas it processes from Amerada Petroleum Corporation with whom it has a working arrangement or contract for the processing of natural gas. If the Utility were to serve the areas and communities in question in this proceeding it would have to elect to purchase gas from these suppliers for transmission and distribution or to transport gas into North Dakota from its out of state facilities. The Utility elected to negotiate for the purchase of gas from the North Dakota suppliers and according to the testimony introduced before the Commission, negotiations extending over a period of some four years took place before contracts finally were negotiated. In the final form, two contracts were entered into between the Utility and each of the said suppliers, one for the purchase of "firm" gas and the other for "dump" gas. The price to be paid for the "firm" gas was considerably higher than the price agreed to be paid for the "dump" gas. All gas to be supplied the Utility through the Signal Oil & Gas Company facilities. The Utility agreed to purchase under the "firm" gas contract all gas necessary for distribution in the proposed "new market area" of the Utility or, in other words, all gas necessary to serve the communities within North Dakota, located north and east of the Missouri River except for the communities of Williston and Bismarck and such gas would be charged the Utility under the "firm" gas contract rate. The "dump" gas to be transported by the Utility through its pipe lines from the Signal plant at Tioga, westerly into the Utility's system in Montana for storage or other uses, and thus could by the Utility be transported back into North Dakota for distribution and sale within the state through other facilities of the Utility in three existing transmission lines of the Utility presently serving communities in southwestern North Dakota, south and west of the Missouri River plus Bismarck and Williston, and in the event of deficiency of "firm" gas, the "new market area" during periods of such deficiency. Both the "firm" gas and "dump" gas were provided by the contracts to be of the same quality.

The Utility in computing its proposed rates for the proposed new distribution area and the communities of Williston and East Fairview used the "firm" gas contract rate. As previously stated the Commission found that this price was in excess of fair market value and premised that decision on the fact as found by the Commission that the suppliers, to wit, Amerada Petroleum Corporation and Signal Oil & Gas Company would make excessive profits therefrom. In determining the facts upon which this conclusion was based the Commission examined officers, employees and records of the suppliers and also official records filed with state officials by the suppliers. They found that in processing the wet gas gathered by the Signal plant from the wellheads, several by-products were produced by extraction, a necessary operation to produce residue gas to supply the Utility under the contract. That such by-products consist of sulphur, butane, propane, casinghead gasoline and crude oil of marketable nature. These by-products when sold by the suppliers would produce substantial income. This income, plus the anticipated income from the sale of residue gas to the Utility at "firm" gas contract rates will result in excessive profits to the suppliers, and therefore the Utility had agreed in its "firm" gas contract to a price for residue gas in excess of fair market value or price as contemplated by Section 49-0604, NDRC 1943. The Utility challenges this method of arriving at a fair market value or price of a commodity they purchase and say it is error.

Thus one question for us to determine upon this appeal is whether or not the Commission may examine into the question of profits of suppliers of a commodity to a utility when such suppliers are not in any

manner connected with the Utility as provided by Section 49–0202(6) of the 1957 Supplement to the NDRC of 1943 as a method of determining fair market value for the commodity in question in carrying out the Commission's duty as provided in Section 49–0203, NDRC of 1943.

Sub-section 6 of Section 49–0202, 1957 Supplement to NDRC 1943, reads as follows:

"Powers of Public Service Commission With Reference to Public Utilities. The commission shall have power: * * * 6. The public service commission may in its discretion require proof that no unreasonable profit is made in the sale of materials to or services supplied for any utility company by any firm or corporation owned or controlled directly or indirectly by such utility company or any affiliate, subsidiary, parent company, associate, or any corporation whose controlling stockholders are also controlling stockholders of such utility company, before permitting the value of said materials or services to be included in valuation or cost of operations for rate making purposes. If unreasonable profits have been made in any such transactions, valuations of said materials and services may be reduced accordingly."

It is admitted that this section does not apply in the instant case. Section 49–0604, NDRC of 1943 reads as follows:

"Fair Market Price To be Allowed in Fixing Valuations. The commission, in determining the rates to be charged by any utility under its jurisdiction, shall ascertain whether an advanced or fictitious cost price, or a price in excess of the fair market value of any commodity, machinery, equipment, material, or service has been paid or is being paid or charged, by said public utility. If it shall appear that any such fictitious or advanced price has been or is being paid or

charged, the commission shall fix and allow as a part of the valuation or rate basis only the reasonable and fair market price of such items, at the time of the purchase, eliminating all such fictitious or excessive prices or values."

The suppliers, Amerada Petroleum Corporation and Signal Oil & Gas Company own the only source of residue gas suitable and in sufficient supply in North Dakota to meet the utility's requirements. Thus there were no competitors vying to meet the Utility's needs.

Market value is defined in Webster's New International Dictionary, Second Edition Unabridged as:

"The price which a man can expect to receive; the average value of a commodity in a given market during a short period of time, as distinct from *normal value,* which can be found only by observing very long periods."

The same dictionary defines market price as follows:

"The price actually given in current market dealings; the price at which the supply and demand are equal."

Research by this court has failed to produce any case which has determined market value or market price on a basis of the profit to the seller. Ordinarily fair market value or a reasonable fair market price are synonymous. We believe the Commission was in error in determining fair market value of a commodity by finding that the suppliers of the commodity to the Utility were making an unreasonable profit from the overall operations of its plant when it produced and sold several products which through its skill of operation and efficiency of management utilized and produced and made available for sale all of the various component parts contained in the wet gas produced at the well-head. This is not the proper method for determining whether or not the price which the suppliers negotiated with the Utility for the

sale of the residue gas is fair market price or fair market value. On the basis of this reasoning the Commission could have found that the residue gas had only nominal value or no value at all, because the suppliers were making a reasonable profit on the marketing of the by-products, and on the other hand if the suppliers' management was poor its methods of operation inefficient, the value of the residue gas might be determined to be an amount considerably in excess of the amount determined to be the value by the normal methods of price determination in commerce. As stated heretofore we find no precedent anywhere which establishes fair market value or reasonable and fair market price on the basis of the profit to the seller.

The relationship of the corporations involved do not come within the provisions of Sections 49–0202, (6) of the 1957 Supplement to the NDRC of 1943 and this statute is not applicable to the instant case and the Commission upon its own motion could not adopt it as a regulation. The Public Service Commission has only such powers in the regulation of public utilities as have been conferred upon it by the legislature, NDRC 1957 Supplement, 49–0301 and 49–0202; NDRC 1943, 49–0201, 49–0203, Constitution, Sections 82 and 83. See Williams Electric Co-operative, Inc. v. Montana-Dakota Utilities Co., N.D., 79 N.W.2d 508; City of Grafton v. Otter Tail Power Co., N.D., 86 N.W.2d 197.

We think the Commission was in error in using as a basis, the profit to the seller, as a method of determining fair market value or fair market price under Section 49–0604, NDRC of 1943 when none of the requisites provided by Sec. 49–0202(6), 1957 Supplement to NDRC of 1943 exist.

The Commission also challenges the District Court in its findings of fact when it found as follows:

"That there is insufficient evidence to support a finding by the Commission that there was an excess investment of $750,000.00 by the company in the Tioga to Minot pipe line and that all of the money invested in said pipe line was honestly and prudently invested in facilities used and useful for the service of natural gas to the City of Minot and the other communities between Tioga and Minot."

The Commission had found relative thereto as follows:

"5. That upon the issue of adequacy of proposed pipe line facilities the Commission finds as follows:

"C. That the natural gas transmission line between Tioga and Minot, North Dakota, has an excess or overdesigned capacity of 4 inches, and by the admission of the applicant, this excess capacity representing installed cost of $750,000.00. That this $750,000.00 excess investment, by the testimony of witness for the applicant, F. R. Gamble, was considered by the engineers of the applicant and submitted to the Board of Directors of the company, and assumed as a speculative expenditure in contemplation of future extension by the applicant, or another, of the natural gas transmission line from Minot to points in eastern North Dakota, if an additional supply of gas would become available."

The Commission in its findings also stated:

10. "That, upon the issue of the reasonableness of the proposed rate for gas service, the Commission finds as follows:

"B. That the proposed rate 67–N–1 is not reasonable for the following reasons:"

"(1) The rate proposed includes return to Montana-Dakota Utilities Co. of interest on investment of $750,000.00 overdesigned capacity in the transmission line from Tioga to Minot."

That the Commission from the foregoing findings of fact drew the following conclusions of law:

"That the main transmission line between Tioga and Minot, North Dakota, has an overdesigned capacity of 4", representing an investment in excess of existing or foreseeable demand in the amount of $750,000.00; that the lateral connections and distribution systems in the communities involved in this proceeding are adequate to the needs, both present and anticipated."

The Commission argues that the finding of the Court set forth above overruling the Commission's findings are error.

The evidence, we believe, clearly points up the reason for the larger capacity pipe line. The President of the Utility testified when asked to explain why the Utility proposed to construct a 12-inch pipe line from Tioga to Minot, on direct examination as follows:

"The 12-inch pipe line from Tioga to Minot, is substantially larger than would be required to serve Minot alone along with the intervening towns. A 12-inch pipe line is being constructed to Minot in order to provide the first leg of a pipe line system extending into eastern North Dakota, and that size was chosen as an economical size to construct for the amount of gas that is expected to be delivered to eastern markets."

And when asked under direct examination whether the 12-inch pipe line was of sufficient size to transport the gas necessary to provide natural gas service in the eastern portion of North Dakota he answered in the affirmative.

In further explanation of the company's obligation in connection with the construction of the pipe line he testified:

"The Company's obligation is that when Amerada has developed 25 million feet per day production from the

Silurian and the Devonian, Montana-Dakota must elect within 120 days either to refuse to take that gas or to notify Amerada that Montana-Dakota will proceed with the construction of pipe lines into eastern North Dakota.

"There is one clause in the contract with Amerada and Signal to which I did not call particular attention and that is in the event that Montana-Dakota elects not to purchase that gas then Montana-Dakota agrees to transport such excess gas in its pipe line to Minot, and it shall receive for such transportation an amount which will come to six percent return on its investment in the capacity required and available for that transportation."

This is followed by testimony correcting the return on its investment at 6½ percent.

The Vice President, Treasurer of the Utilities Company in part testified:

"Now I have made no mention of the extension of this project beyond Minot. Of course that was a prime consideration in the development of the entire project. In other words, in looking at this whole picture the company did not limit its consideration to the business available to it on the application as now before this Commission. We gave equally important consideration to the prospective development of business east of Minot."

He was then asked the question:

"You participated in the decision to construct the 12-inch line with the view of going further east rather than an 8-inch line which would have been ample to serve Minot and the intervening market from Tioga, isn't that correct? to which he answered:

"That is correct. The matter was submitted by our engineers and accountants to the officers, who have in turn submitted the entire project to the

Board of Directors, of which I am a director, and based on these reports the directors determined that the many attractive features of the development of the opportunity to serve the market east of Minot fully warranted going ahead with the project on the basis of future extension."

"At this time, as you have mentioned, we are investing, will if this project is approved, approximately three-quarters of a million dollars in this pipe line that would not be necessary if we were going to stop at Minot. But based on the expected development of additional reserves in the Tioga area and possible other reserves or gas within the area, we determined to go ahead with the 12-inch pipe line."

"Q. And obviously having come to that conclusion and made that decision, your investment of three-quarters of a million dollars, you feel is indicative of your intention to go further east when the gas supply is available? A. I don't know of any other evidence that could be more conclusive than putting your money into the project. I can't think of anything that could be more conclusive of our intention."

When the witness was asked if he had anything further to offer he stated in part:

" * * * If we were going to build to Fargo and Grand Forks at this time the work we are now doing would be exactly the same as a projected line into the Red River valley. * * *"

On cross examination the following question and answer of this witness is shown:

"Q. The engineering staff that is associated with your company advised that a 12-inch line be laid between Tioga and Minot, is that not so? A. Yes, it was based on the engineering studies. Of course the economies enter into the picture also."

"Q. So with due regard to the interest of your stockholders, if the directors of the company determined a three-quarter of a million dollar investment in excess of immediate needs was justifiable? A. That is correct."

It is argued that the additional investment of about $750,000 for the construction of the larger pipe line should be included in the rate base by the Commission for the reason that the pipe line itself before extension would provide some storage cushion against fluctuations in the supply of gas or short term breakdown. The line being purely an intrastate line without any other storage facilities available and this reasoning is supported in the testimony of the President of the Utility as follows:

"Q. You are asking this Commission to approve the construction of substantially greater pipe line capacity than is required by the market which you intend to serve by that pipe line, is that correct? A. That is correct.

"Q. And the reasonableness of that additional, or immediately superfluous capacity must be judged by the reasonableness of the anticipated increased gas production reserve? A. That is mainly it. The other feature is the one I mentioned a minute ago, in that that quantity of gas will store about 30 million feet at a pressure of 700 pounds, which during the period before some of these other matters are ironed out will serve as a standby and guarantee of service to Minot.

"Q. What I want to get from you as a policy witness is this: in your opinion who should bear this risk, this initial investment, the stockholders of Montana-Dakota or its rate payers? A. Well, I think if development doesn't take place and that line is required in order to guarantee service to Minot, then it properly should be borne by the rate payers. That, again, is one of these future risks.

"Q. It is a question of fact. If it were not then it should be borne by the stockholders, is that your opinion? A. I don't know who else would bear it."

The evidence shows another service is provided in the event of emergency which is clearly set forth in the evidence given by the Assistant Vice President and Gas Engineer of the Utility. He testified as follows:

"In connection with the application for the service from Tioga to Minot and the application for the construction to our Williston line we will install two meter runs in a single meter house on the grounds of the Signal plant at Tioga. These meter runs will be parallel, run parallel, approximately six feet apart, and we will install a 6-inch connection between them containing a plugged valve which under ordinary circumstances would remain locked."

"Q. When you say under ordinary circumstances do you mean except in case of emergency it would remain locked? A. That is correct.

"Q. And in case of emergency which way would the gas flow? A. From west to east."

In other words the Utility proposed to build two pipe lines both commencing at the same source of gas, one line to run west to connect with the Utility's interstate facilities at Williston and would be an interstate line and the other line to run east is proposed to be a purely intrastate line. That, however, a connecting line six inches in diameter is proposed to connect these two lines and which line will contain a valve which will remain plugged or closed and opened only in case of emergency. Normally the gas from the Signal plant will flow west in the interstate line running to Williston and beyond, and east in the intrastate line running to Minot. However, in a case of emergency the valve would be opened and the flow of gas in the interstate line running to Williston would be reversed and made to flow east through the connecting line and thus it would serve the new market area located between Tioga and Minot and the intervening communities.

The testimony also shows that the excess size of the proposed pipe line from the Signal plant in Minot will create storage facilities for about a one-day service only to the communities served by this pipe line.

■■ We believe the evidence is all but conclusive that the excessive size of the pipe line proposed from the Signal plant at Tioga to Minot is not necessary to serve the communities proposed and not at the present actually to be used nor be made useful for the purpose of rendering its public service to Minot and the intervening communities. It may be a prudent investment to provide for possible future growth by expansion into other and new communities to the east at some future date providing sufficient gas is made available. The anticipated patrons of the company under the present proposal cannot be burdened in order to provide for possible needs of other patrons in other communities some time in the future. We feel the Commission was right in its determination and the Court in error in reversing it, 43 Am. Jur. Public Utilities, and Service. Section 106, page 647.

Section 49–0601 of NDRC 1943 provides within the limitations therein set forth that the Commission shall investigate and determine the value of the property of the Utility used and useful for the service and convenience of the public.

In San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 446, 23 S.Ct. 571, 574, 47 L.Ed. 892, a water plant had been overbuilt to irrigate an area of 6,000 acres which it did not, in fact, supply. The rates were fixed on the theoretical assumption that this business did exist to fit the valuation of the plant, but of course no revenue

was derived from the assumed but actually non-existent business. The United States Supreme Court held the rates were not confiscatory, saying, "If a plant is built, as probably this was, for a larger area than it finds itself able to supply, or, apart from that, if it does not, as yet, have the customers contemplated, neither justice nor the Constitution requires that, say, two thirds of the contemplated number should pay a full return." The effect of this was to allow the Utility a fair return only on a rate base sufficient to supply the existing demand.

In the case of Cedar Rapids Gaslight Co. v. City of Cedar Rapids, 144 Iowa 426, 120 N.W. 966, 969, 48 L.R.A.,N.S., 1025, the Court stated:

"Across the street from the plant are lots 1 to 5 in block 9, known as the 'Annex,' and on which there are 13 small houses, rented by the company. The cost of these lots was $6500 some eight years prior to the trial. The plaintiff estimated that their value has increased to $16,500. On the other hand, the city contends that they should not be considered at all in determining the value of the plant. The evidence is all but conclusive that they will not be required for the immediate expansion of the work, even though the officers of the company may have had this in contemplation. A witness for plaintiff testified that, with little more machinery, the present plant could be made to manufacture more than three times as much gas as now sold. Another justified his conclusion that the annex should be included by saying that the purchase was a wise precaution, and that, in view of the past growth of the city, these lots likely would soon be needed. The lots or others may be required sometimes, but no man can determine the contingencies of the future, and it will not do to burden the patrons of to-day in order to provide the possible needs of those five or ten years hence, at least when

this is conceded not to be necessary in order to provide for equal facilities when demanded. This property should not be included."

In Columbus Gas & Fuel Co. v. Public Utilities Commission of Ohio et al. and the City of Columbus, 292 U.S. 398, 54 S.Ct. 763, 767, 78 L.Ed. 1327, the United States Supreme Court, in holding that there was no need in the computation of the rate base to include the value of gas fields not presently in use but owned by the Utility unless the time for using them is so near that they may be said at least by analogy to have a quality of working capital and stated:

"Leases bought with income, the proceeds of the sale of gas, and thus paid in last analysis through the contributions of consumers, ought not in fairness to be capitalized until present or imminent need for use as sources of supply shall have brought them into the base upon which profits must be earned. To capitalize them sooner is to build the rate structure of the business upon assets held in idleness to abide the uses of the future. At times the immediate purpose of buying up extensive tracts is to forestall or stifle competition that might bring the prices down. There is adequate compensation for investment so remotely beneficial when the cost of renewing fields in present operation, and thus replenishing the capital, is paid out of gross earnings as an expense of operation, with a proportionate increase of the prices to be charged for the gas thereafter."

And in Consolidated Gas Co. v. City of New York, C.C., 157 F. 849, it was held:

"Real estate owned by complainant, but not used in the business, should not be included as a part of the capital invested, unless it is shown that its use will necessarily be required in the near future; nor should the income derived from such land be included in the earn-

ings, nor the taxes paid therein in the expenses, of the business."

And in State ex rel. City of St. Louis v. Public Service Commission et al. (State ex rel. Laclede Gaslight Co. v. Same), 341 Mo. 920, 110 S.W.2d 749, it was held:

"A public utility cannot maintain equipment of comparatively small or no useful value on premises unnecessarily large and valuable and demand a return upon the whole."

In the Cedar Rapids Gaslight Co. v. City of Cedar Rapids case, supra, on page 970 of 120 N.W., the court said:

"The company extended its activities so as to furnish gas to the people of Kenwood Park and Marion in 1905, and to do this laid a high pressure pipe from the holder to these places. The cost of this pipe to the city limits was $5,483, and was originally charged to the Marion line. The evidence is to the effect that the pressure from this pipe somewhat reinforces the system, and that a few residents of the city are furnished gas therefrom; but its principal use is to carry gas to the consumers beyond the city limits, and no more than one-fourth its value should be included in the appraisement."

We feel these cases support our position. We hold the District Court was in error in making this finding. However, we believe it pertinent to point out the following:

The Commission did not find a rate base, it did find the rate base as submitted by the Utility was excessive by $750,000. The rate base submitted by the Utility equalled $4,274,016. The pro-forma estimated earnings at the end of the third year of operation was estimated by the Utility at $139,109 indicating a rate of return of 3.25 percent. The Commission in its first orders found a return of 3.25 percent was not excessive. We agree. Deducting $750,000, excessive construction cost, from $4,274,-

016 equals $3,524,016. The pro-forma estimated income account would not change because of the reduction of the rate base. The estimated earnings at the end of the third year would on the reduced rate base indicate a rate of return of 3.95 percent which we do not deem excessive, as long as the rates are competitive with other fuels available and used in the area served. The evidence indicates the rates are competitive.

█ The Commission shall supervise the rates of all public utilities, and have the power, after notice and hearing, to originate, establish, modify, adjust, promulgate, and enforce rates in accordance with the provisions of law. Sec. 49–0203, NDRC 1943. This is a continuing duty to supervise, coupled with the necessary regulatory power. Therefore, when the pro-forma estimated earnings are proven or disproven by experience such adjustments or modifications may be made in the rate structure necessary and proper under the facts and the law.

█ The final contention of the appellant is that the courts do not have jurisdiction. The amended orders of the Commission in each of these cases are final orders. They provide the rate permitted to be charged by the Utility for natural gas service in the various communities under consideration in these cases by reference to rate numbers already established in other cases before it, except for two communities. The Commission approved rate number 60.1–N–1 which the Utility had requested for the communities of Williston, and East Fairview. It ordered that rate number 60–N–1, which was a rate schedule previously approved by the Commission in another case establishing the rates to be charged by this Utility in communities along its so-called Bismarck line, as the rate schedule to be charged by the applicant in the communities of Epping, Wheelock, Ray and Springbrook in one case and the communities of Tioga, Berthold, Burlington, Des Lacs, Palermo, Ross, White

Earth, Stanley and Minot in the other case. These are final orders of the Commission establishing the rates that may be charged by the Utility for its natural gas service in the communities in question in these two cases. Because the Commission adopted rates already in existence in another part of the Utility's system serving communities in the State of North Dakota, it contends it is an order providing for the uniformity of rates. We find it is more than that, it is clearly a new rate order affecting the Utility's natural gas service in a new area. It is the final order of the Commission and appealable.

Section 49-0512, NDRC of 1943 provides:

"Any party to any controversy heard by the commission feeling aggrieved by the decision or by the entry of any final order of the commission therein may appeal therefrom to the district court in the manner prescribed in chapter 32 of the title Judicial Procedure, Civil."

Chapter 32 of the title, Judicial Procedure, Civil, is the Administrative Agencies, Uniform Practice Act. This Act also provides the judgment of the District Court may be reviewed in the Supreme Court on appeal in the same manner as any case tried to the Court without a jury may be reviewed. See Section 28-3221, NDRC of 1943.

The purpose of the review is not to substitute the court's judgment for that of the Commission, but to review the record and if the record is insufficient, or the order thereon made illegal or without warrant, the court may take such action as is proper to secure a proper record and a proper order. State ex rel. Hughes v. Milhollan, 50 N.D. 184, 195 N.W. 292; North Dakota State Highway Commission v. Great Northern Railway Co., 51 N.D. 680, 684, 200 N.W. 796.

The case is therefore remanded to the District Court with instructions to return the case to the Commission in order to give it an opportunity to reconsider the evidence and amended findings and order herein in the light of the rules laid down in this opinion.

The judgment of the District Court is modified accordingly.

Each party shall pay its own costs of this appeal.

SATHRE, C. J., and TEIGEN, BURKE, MORRIS and STRUTZ, JJ., concur